142 F.3d 449
 46 ERC 1417, 330 U.S.App.D.C. 1, 28
Envtl. L. Rep. 21,111
 MOTOR & EQUIPMENT MANUFACTURERS ASSOCIATION, et al., Petitioners,
v.
Mary D. NICHOLS, Assistant Administrator and Environmental
Protection Agency, Respondents,
American Automobile Manufacturers Association, et al., Intervenors.
MOTOR & EQUIPMENT MANUFACTURERS ASSOCIATION, et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner,
Administrator, United States Environmental
Protection Agency, Respondents,
American Automobile Manufacturers Association and
Association of International Automobile
Manufacturers, Inc., Intervenors.
 Nos. 96-1392 and 96-1397.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 22, 1998.
Decided April 24, 1998.
 
 On Petitions for Review of an Order of the Environmental Protection Agency.
 Michael J. Conlon argued the cause in No. 96-1392 for petitioners, with whom Marc L. Fleischaker, Donald B. Mitchell, Jr., Evan S. Stolove, John Russell Deane, III, Christopher J. Kersting, Basil J. Mezines and Michael T. Reid were on the briefs. Louis R. Marchese entered an appearance.
 Michael J. Horowitz, Attorney, Environmental Protection Agency, argued the causes for respondents, with whom Lois J. Schiffer, Assistant Attorney General, U.S. Department of Justice, Jeffrey K. Lee, Attorney, and Jonathan Z. Cannon, General Counsel, Environmental Protection Agency, were on the brief. Karen L. Egbert, Attorney, U.S. Department of Justice, entered an appearance.
 Clifford T. Lee, Deputy Attorney General, State of California, argued the cause in No. 96-1392 for intervenor California Air Resources Board, with whom Daniel E. Lungren, Attorney General, and Michael Terris, Senior Staff Counsel, California Air Resources Board, were on the brief.
 John H. Beisner, John A. Rogovin, Martha Dye, Richard A. Penna, Howard E. Shapiro, V. Mark Slywynsky, Charles H. Lockwood and John T. Whatley were on the brief in No. 96-1392 for intervenors American Automobile Manufacturers Association and Association of International Automobile Manufacturers, Inc.
 Marc L. Fleischaker argued the cause in No. 96-1397 for petitioners, with whom Donald B. Mitchell, Jr., Evan S. Stolove, John Russell Deane, III, Christopher J. Kersting, Basil J. Mezines, Michael J. Conlon and Michael T. Reid were on the briefs. Louis R. Marchese entered an appearance.
 John H. Beisner argued the cause in No. 96-1397 for intervenors, with whom John A. Rogovin, Martha Dye, Richard A. Penna, Howard E. Shapiro, V. Mark Slywynsky, Charles H. Lockwood and John T. Whatley were on the brief.
 Before: EDWARDS, Chief Judge, WALD and ROGERS, Circuit Judges.
 ROGERS, Circuit Judge:
 
 
 1
 These two appeals present Clean Air Act ("CAA" or "the Act") challenges to California's latest round of automobile on-board emissions diagnostic device ("OBD") regulations. Petitioners are a number of associations that represent businesses that manufacture, rebuild, and sell car parts in what is known as the automobile "aftermarket," in that the parts they make and sell are meant to replace the parts installed by the original automobile manufacturers. In the first appeal, they challenge the Environmental Protection Agency's ("EPA") decision to permit California to enforce its own regulations of the OBDs pursuant to section 209(b) of the CAA (the "waiver decision"). In the second appeal, petitioners challenge EPA's rule deeming compliance with the California diagnostic device regulations to constitute compliance with the federal diagnostic device regulations (the "deemed-to-comply" rule).
 
 
 2
 Petitioners contend that both the waiver decision and the deemed-to-comply rule run afoul of CAA subsections 202(m)(4) and (5). Those subsections require the data collected by the diagnostic devices to be easily accessible and understandable to all mechanics who service automobiles, whether they are independent or affiliated with an automobile manufacturer. EPA concluded that California's regulations complied with subsections (m)(4) and (5), and we defer to the agency's reasonable interpretation of the CAA. Preliminarily, however, we hold that certain parts of the petitions are moot in view of the most recent revisions to the California regulations, and that our review of one challenge to the deemed-to-comply rule based on CAA section 202(b)(1)(C) is barred for failure to exhaust administrative remedies. Petitioners have standing to challenge EPA's deemed-to-comply rule, however, and timely presented their challenge to that rule. Furthermore, we hold that EPA's waiver decision was not inconsistent with the CAA. In sum, the agency acted within its authority in promulgating both rules. Accordingly, we deny the petitions in part and dismiss in part.
 
 I.
 A. The Clean Air Act
 
 3
 The Clean Air Act, 42 U.S.C. §§ 7401-7671q (1988 & Supp. V 1993), regulates air pollution by establishing air quality standards for certain pollutants and controlling the emissions of approximately 189 hazardous pollutants. See CAA §§ 109, 112, 42 U.S.C. §§ 7409, 7412.[1] The Act establishes a two-pronged federal-state approach limiting motor vehicle pollution. See generally Engine Mfrs. Ass'n v. EPA, 88 F.3d 1075, 1078 (D.C.Cir.1996). The states regulate automobiles after they have been purchased by consumers through inspection and maintenance programs. See CAA §§ 174, 176, 182(b)(4), (a)(2)(B), 42 U.S.C. §§ 7504, 7506, 7511a(b)(4), (a)(2)(B). Inspection and maintenance programs are designed to identify and ensure the repair of in-use automobiles that are emitting excessive pollutants. Subchapter I of the Act is primarily concerned with the ground rules for the implementation of these post-purchase programs by the states. Subchapter II of the Act vests in the federal government the almost exclusive responsibility for establishing automobile emission standards for new cars. See CAA §§ 202, 209(a), 42 U.S.C. §§ 7521, 7543(a). One state, California, is permitted to establish its own automobile emissions standards for new cars. See CAA § 209(b), 42 U.S.C. § 7543(b); Engine Mfrs. Ass'n, 88 F.3d at 1078 & n. 9. Other states are permitted to adopt California's standards instead of those promulgated by the federal government. See CAA § 177, 42 U.S.C. § 7507. The effect of the Clean Air Act is that new "motor vehicles must be either 'federal cars' designed to meet EPA's standards or 'California cars' designed to meet California's standards." Engine Mfrs. Ass'n, 88 F.3d at 1080.
 
 
 4
 The California exception is intended "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." H.R.Rep. No. 95-294, at 301-02 (1977), quoted in Motor and Equip. Mfrs. Ass'n, Inc. v. EPA, 627 F.2d 1095, 1110 (D.C.Cir.1979) ("MEMA I"). However, California is required to determine that its standards will be "in the aggregate, at least as protective of public health and welfare as applicable Federal standards" before promulgating them. CAA § 209(b)(1), 42 U.S.C. § 7543(b)(1). Furthermore, California may only adopt and enforce its own emission standards after receiving a waiver of preemption from the EPA. See Motor Vehicle Mfrs. v. New York State Dep't of Envtl. Conservation, 17 F.3d 521, 526 (2d Cir.1994). The EPA Administrator, in turn, may only deny California's waiver application if she finds that (1) the state's protectiveness determination is arbitrary or capricious, (2) California does not need separate state standards to meet "compelling and extraordinary conditions," or (3) California's "standards and accompanying enforcement procedures are not consistent with" section 202(a) of the Act [42 U.S.C. § 7521(a) ]. CAA § 209(b)(1), 42 U.S.C. § 7543(b)(1).
 
 
 5
 OBDs were first installed by automobile manufacturers in 1981.[2] OBDs monitor, control, and record the emissions released by automobile engines.[3] They also store information about emissions system faults for later retrieval.[4] The devices warn drivers of problems through the "check engine" lights placed on the dashboards of new cars.
 
 
 6
 These lights illuminate when the vehicle's monitoring system detects an engine malfunction. At the same time the light illuminates, trouble codes indicating the source of the problem are stored in the vehicle's computer, where they may be accessed by repair personnel, sometimes using a plug-in tool to aid in diagnosis.
 
 
 7
 Control of Air Pollution from New Motor Vehicles, 56 Fed.Reg. 48,272, 48,274 (1991) (proposed Sept. 24, 1991).
 
 
 8
 In 1990 Congress amended the CAA to require EPA to mandate and regulate the installation of OBDs in all new cars. See CAA Amendments, P.L. No. 101-549, § 202(m), 104 Stat. 2399 (codified at 42 U.S.C. § 7521(m) (Supp. V 1993)). Through the use of these devices, Congress sought accurate identification of "emission-related systems deterioration or malfunction," in order to "alert[ ] the vehicle's owner or operator to the likely need for emission-related ... maintenance or repair." CAA § 202(m)(1), 42 U.S.C. § 7521(m)(1). Congress also hoped to "facilitate the ability of repair facilities, including independent repair facilities, to properly diagnose emission component malfunctions."[5] In order "to assure that all vehicle manufacturers use [OBDs] that can be readily accessed and interpreted,"[6] Congress instructed EPA to promulgate regulations that
 
 
 9
 requir[e] (subject to the provisions of section 7542(c) of this title regarding the protection of methods or processes entitled to protection as trade secrets) manufacturers to provide promptly to any person engaged in the repairing or servicing of motor vehicles ... any and all information needed to make use of the emission control diagnostics system....
 
 
 10
 CAA § 202(m)(5), 42 U.S.C. § 7521(m)(5). The statute also requires
 
 
 11
 (A) that any connectors through which the emission control diagnostics system is accessed for inspection, diagnosis, service, or repair shall be standard and uniform on all motor vehicles and motor vehicle engines;
 
 
 12
 (B) that access to the emission control diagnostics system through such connectors shall be unrestricted and shall not require any access code or any device which is only available from a vehicle manufacturer; and
 
 
 13
 (C) that the output of the data from the emission control diagnostics system through such connectors shall be usable without the need for any unique decoding information or device.
 
 
 14
 CAA § 202(m)(4), 42 U.S.C. § 7521(m)(4).
 
 
 15
 Following the 1990 amendments, EPA promulgated an initial set of OBD regulations. It construed section 202(m)(4) to
 
 
 16
 require[ ] that OBD system information be unrestricted and accessible to anyone via standardized connectors without requiring access codes or any device only available from the manufacturer. Further, the OBD system information must be usable without need for any unique decoding information or device. To satisfy these mandates, EPA [required] that OBD systems conform to uniform industry standards ... and be accessible with the use of a standard hand-held diagnostic tool.
 
 
 17
 Control of Air Pollution from New Motor Vehicles, 58 Fed.Reg. 9468, 9471-72 (1993) (to be codified at 40 C.F.R. pt. 86). These regulations, however, did not include the "final requirements under which information ... would be made available to the service and repair industry." Id. at 9468.
 
 
 18
 In 1995, EPA promulgated a "Service Information Rule" implementing section 202(m)(5). See Control of Air Pollution from New Motor Vehicles, 60 Fed.Reg. 40,474 (1995) (codified at 40 C.F.R. pts. 9, 86). In that rule, EPA "require[d] vehicle manufacturers to provide to the service and repair industry information necessary to service on-board diagnostic (OBD) systems and to perform other emission-related diagnosis and repair." Id. at 40,474. EPA declined, however, to interpret the rule to require the dissemination of all OBD programming information. The agency concluded that under section 202(m)(5),
 
 
 19
 [m]anufacturers are only required to provide information in order for persons to service and repair vehicles. They are not required to provide recalibration information that is not needed to make emissions-related diagnosis and repairs, even if such information may be useful for the manufacture of aftermarket parts.
 
 
 20
 Id. at 40,479. EPA also concluded that "manufacturers should be allowed to develop and implement the systems which they believe are most secure, such as encryption systems." Id. at 40,493.
 
 B. California's OBD Regulations
 
 21
 California first required automobile manufacturers to install OBDs in new cars sold in the state in 1988--two years before Congress mandated the installation of OBDs in cars sold nationwide.[7] It revised those regulations for use in 1994 model year cars (the "OBD II" regulations). The state expects the OBD II devices to detect misfires and monitor catalyst efficiency, evaporative systems, exhaust gas recirculation systems, fuel systems, oxygen sensors, secondary air systems, and electronic emission-related powertrain components, among other things. See 15 CAL. REG. L. REP. 124, 126 (1995).
 
 
 22
 California has long been concerned that OBDs could easily be disabled, altered, or replaced with parts manufactured by independent parts manufacturers in the aftermarket, negating their ability to restrict automobile emissions. For example, the state has evinced concern that the computer chips that control the OBDs could be replaced by "performance chips" that reset the operating parameters of the emissions controls imposed by the devices on automobile exhaust systems. See 56 Fed.Reg. at 48,276 (describing the effects of performance chips). In 1989 California's Air Resources Board ("CARB") staff reported that "[a]ftermarket 'performance chips' ... usually alter the emission control system calibration and in many cases disable emission control equipment."[8] The report recommended that anti-tampering features be required for OBDs so that such chips could only be substituted with difficulty. Id. In 1992, CARB's staff reiterated its concern that "there are no straightforward means of regulating the use of" aftermarket chips, and accordingly explained that "the OBD II requires vehicle computer monitoring systems to be tamper-proof to help ensure that such chips cannot be used." Letter from CARB to William Reilly, Administrator, EPA 4 (Sept. 15, 1992). The state therefore required that "[c]omputer-coded engine operating parameters" not be alterable without "specialized tools and procedures." CAL.CODE REGS. tit. 13, § 1968.1(d) (1993). California also required all "reprogrammable computer code system[s]" to "include proven write-protect features." Id. In addition, the state briefly insisted that manufacturers "include enhanced tamper protection strategies including data encryption using methods to ensure the encryption algorithm, and write protect features requiring electronic access to an off-site computer maintained by the manufacturer" in their OBDs beginning with the 1999 model-year. CAL.CODE REGS. tit. 13, § 1968.1(d) (1995). CARB recently deleted the off-site computer requirement from the state's regulations. CARB, INITIAL STATEMENT OF REASONS FOR PROPOSING RULEMAKING 24-25 (1996).
 
 
 23
 Consequently, as of September 25, 1997, California's revised anti-tampering regulations read:
 
 
 24
 Computer-coded engine operating parameters shall not be changeable without the use of specialized tools and procedures (e.g., soldered or potted computer components or sealed (or soldered) computer enclosures). Subject to Executive Officer approval, manufacturers may exempt from this requirement those product lines which are unlikely to require protection. Criteria to be evaluated in making an exemption include, but are not limited to, current availability of performance chips, high performance capability of the vehicle, and sales volume.
 
 
 25
 CAL.CODE REGS. tit. 13, § 1968.1(d) (1997).
 
 
 26
 While California amended its anti-tampering regulations, the state also sought a waiver of federal preemption for its OBD II regulations. On June 14, 1995, CARB requested the EPA Administrator to grant a waiver of preemption for California's regulations as they stood in 1995. After notice and comment, EPA concluded that California had complied with the relevant requirements of the Clean Air Act, and granted CARB's application for a waiver. See California State Motor Vehicle Pollution Control Standards, 61 Fed.Reg. 53,371 (1996). Petitioners sought review of the EPA Administrator's decision in this court, pursuant to section 307(b)(2) of the Act. See CAA § 307(b), 42 U.S.C. § 7607(b)(2).
 
 C. The Deemed-to-Comply Rule
 
 27
 As part of the first federal OBD rule promulgated in 1993, EPA included its own anti-tampering regulations as well as a "deemed-to-comply" rule. See 58 Fed.Reg. at 9486. Under that rule, "[d]emonstration of compliance with California OBD II requirements [would] satisfy [EPA] requirements ... through the 1998 model year." Id. EPA explained that "[f]or the 1994 through 1998 model years, [it would] enforce OBD requirements against either the California OBD II requirements ... or the Federal OBD requirements." 58 Fed.Reg. at 9476. A number of aftermarket organizations promptly filed suit challenging these provisions. See Specialty Equip. Market Ass'n v. Browner, No. 93-1277 (D.C.Cir. May 19, 1994). As a result of an agreement between the petitioners and EPA, however, both parties requested the court to issue an order declaring the anti-tampering provision of the final rule, and any reference to California's antitampering regulations, to be "vacated and ... void ab initio." The court thereafter issued an order vacating the relevant provisions.
 
 
 28
 Following the settlement, EPA promulgated a revised final rule in 1995. The agency explained at the time, however, that it was
 
 
 29
 continuing to review its policy concerns regarding tampering. EPA may in the future determine that it is appropriate to promulgate new regulations to address these concerns. If the Agency determines that new regulations are appropriate, EPA will at that time publish a notice of proposed rulemaking addressing these concerns.
 
 
 30
 Control of Air Pollution From New Motor Vehicles, 60 Fed.Reg. 15,242, 15,245 (1995) (codified at 40 C.F.R. part 86).[9] EPA therefore provided that demonstration of compliance with the 1995 version of California OBD II requirements would satisfy the federal OBD requirements, "except that compliance with Title 13 California Code § 1968.1(d), pertaining to tampering protection, is not required to satisfy the requirements of this section." Id. at 15,247. In response to adverse comments by petitioner Motor & Equipment Manufacturers Association (MEMA),[10] however, EPA revised the 1995 rule to remove the reference to compliance with California's most recent regulations. EPA also began a new rulemaking process to update its waiver of the California OBD II regulations, resulting in 1996 in another version of the deemed-to-comply rule. Control of Air Pollution From New Motor Vehicles, 61 Fed.Reg. 45,898 (1996).
 
 
 31
 The 1996 rule now challenged by petitioners represents yet another effort by the agency to "promulgate[ ] appropriate revisions to federal OBD regulations [whereby] compliance with the recently revised [California] OBD II requirements will satisfy federal OBD." Id. at 45,898. The 1996 rule provides that:
 
 
 32
 Demonstration of compliance with California OBD II requirements ... shall satisfy the requirements of this section through the 1998 model year except that compliance with Title 13 California Code § 1968.1(d), pertaining to tampering protection, is not required to satisfy the requirements of this section.
 
 
 33
 40 C.F.R. § 86.094-17(j) (1997). EPA explained: "[t]his final rulemaking allows manufacturers to comply with federal OBD requirements by optionally complying with the revised and recently adopted California OBD II regulations." 61 Fed.Reg. at 45,899. Petitioners appealed, again pursuant to section 307(b) of the CAA. See CAA § 307(b)(2), 42 U.S.C. § 7607(b)(2).
 
 II.
 
 34
 Before reaching the merits of the petitions, we address several justiciability issues raised by EPA.
 
 A. Standing
 
 35
 First, EPA contends that petitioners lack standing to challenge the deemed-to-comply rule. Essentially, the agency focuses on causation and redressibility, maintaining that petitioners lack standing because EPA eliminated the requirement that manufacturers install anti-tampering measures in 1993. According to the agency, the challenged 1996 rule took no action either to permit or forbid the use of such antitampering measures on automobiles. Further, EPA notes, it expressly stated in the rulemaking leading to the 1996 rule that, "[it] is taking no action ... that has any effect on manufacturers [sic] legal requirement or ability voluntarily to equip vehicles with tampering protection measures." 61 Fed.Reg. at 45,901. Regarding redressibility, neither a remand nor a reversal, EPA maintains, would affect the ability, legal or factual, of manufacturers to install anti-tampering measures on their vehicles.
 
 
 36
 The Supreme Court articulated a three-part Article III standing test in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). See also Steel Co. v. Citizens for a Better Env't, --- U.S. ----, ---- - ----, 118 S.Ct. 1003, 1016-17, 140 L.Ed.2d 210 (1998). To have constitutional standing, a petitioner first must have suffered an "actual or imminent," as opposed to "conjectural or hypothetical," "injury in fact." Lujan, 504 U.S. at 560, 112 S.Ct. at 2136 (citations and internal quotations omitted). Second, the injury must be "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." Id. at 560-61, 112 S.Ct. at 2136-37 (citations and internal quotations omitted). Third, it must be "likely" that the injury will be "redressed by a favorable decision." Id. at 561, 112 S.Ct. at 2136; see also Common Cause v. FEC, 108 F.3d 413, 416 (D.C.Cir.1997).
 
 
 37
 Petitioners satisfy the first prong of the Lujan test, which requires a concrete and particularized invasion of a legally protected interest. See Lujan, 504 U.S. at 560, 112 S.Ct. at 2136. They represent persons who manufacture, rebuild, or distribute parts that compete with the parts sold by original automobile manufacturers. "A competitor is adversely affected by and has a substantial interest in orders affecting the matter as to which he is a competitor." Seaboard & Western Airlines v. Civil Aeronautics Bd., 181 F.2d 515, 518 (D.C.Cir.1949). Petitioners' aftermarket parts may be difficult to install in light of California's anti-tampering regulations as condoned by EPA. Difficult installation will presumably reduce the demand for petitioner's parts, while increasing the demand for parts made by the automobile manufacturers that installed the anti-tampering devices. Petitioners are thus "likely to be financially injured" by EPA's deemed-to-comply rule. FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940). "[W]hen a challenged agency action authorizes allegedly illegal [activity] that will almost surely cause [a] petitioner to lose business," that petitioner has standing to make a claim. El Paso Natural Gas Co. v. FERC, 50 F.3d 23, 27 (D.C.Cir.1995); see also Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152-53, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). Hence, the only questions are whether petitioners meet the second and third prongs of the Lujan test, for Article III standing purposes, or are prudentially barred.
 
 
 38
 The EPA contends that the injury suffered by petitioners was not caused by and cannot be remedied by the agency because it is attributable to the automobile manufacturers, a "third party not before the court." Lujan, 504 U.S. at 560, 112 S.Ct. at 2136. Yet petitioners' injury is fairly traceable to EPA's rulemaking, satisfying the second prong of the Lujan test. See id. at 560, 112 S.Ct. at 2136. EPA itself has acknowledged that its deemed-to-comply rule has resulted in an almost unanimous decision by major manufacturers to install OBDs that comply with California's regulations. In a "Dear Manufacturer" letter of November 7, 1997, EPA observed that "only one major automobile manufacturer is selling vehicles certified specifically to the EPA OBD requirements rather than choosing the California OBD II option." Letter from Jane Armstrong, Director, EPA Vehicle Programs and Compliance Division 1 (Nov. 7, 1997). The deemed-to-comply rule has had such an effect because it creates a tremendous incentive for manufacturers to install OBDs that comply with California's regulations in all their cars. By doing so, they need only make one kind of each car they sell instead of two kinds, one of which would be for sale in states that follow California's OBD regulations, and the other for sale in states that follow federal OBD regulations. If the manufacturers were not permitted to use California's OBD II system in the automobiles they make for sale in the states governed by the federal OBD regulations, then fewer cars would be sold with the allegedly illegal California OBDs. There is therefore no doubt that "the unfettered choices made by independent actors have been ... made in such manner as to produce causation." Freedom Republicans, Inc. v. FEC, 13 F.3d 412, 417 (D.C.Cir.1994) (quoting Lujan, 504 U.S. at 562, 112 S.Ct. at 2137 (internal quotation marks omitted)).
 
 
 39
 Also unpersuasive is EPA's contention that petitioners' injury is not redressable by the court. See Steel Co., --- U.S. at ----, 118 S.Ct. at 1017; Lujan, 504 U.S. at 561, 112 S.Ct. at 2136-37. Vacation of the deemed-to-comply rule could remedy their injury by requiring EPA to undertake a new rulemaking with respect to the application of California's OBD II regulations to EPA's OBD program. In that new proceeding, petitioners could argue for the necessity of a stringent bar against any anti-tampering regulations. Cf. Reytblatt v. Nuclear Regulatory Comm'n, 105 F.3d 715, 721 (D.C.Cir.1997). Indeed, petitioners maintain in both appeals that California's policy is unlawful, and were this court to interpret the Clean Air Act to preclude automobile manufacturers from installing any anti-tampering mechanisms, petitioners' task before the agency would be considerably eased.
 
 
 40
 In addition to Article III standing, petitioners have shown that there is no prudential reason to deny them their day in court. See National Credit Union Admin. v. First National Bank & Trust Co. ("NCUA"), --- U.S. ----, ----, 118 S.Ct. 927, 933, 140 L.Ed.2d 1 (1998). Under the Administrative Procedure Act, 5 U.S.C. § 702 (1994), a petitioner can establish "prudential standing" by showing that its interests are "arguably within the zone of interests to be protected or regulated by the statute ... in question." Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 396, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987) (quoting Association of Data Processing Serv. Orgs., Inc., 397 U.S. at 153, 90 S.Ct. at 829-30). Petitioners are "suitable challengers to enforce" the Clean Air Act provisions at issue,First Nat'l Bank & Trust Co. v. National Credit Union Admin., 988 F.2d 1272, 1276 (D.C.Cir.1993), especially because this "test is not meant to be especially demanding." Clarke, 479 U.S. at 399, 107 S.Ct. at 757. A would-be plaintiff is outside the statute's "zone of interests" only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id.; see also NCUA, --- U.S. at ---- - ----, 118 S.Ct. at 935-36. Petitioners contend that CAA subsections 202(m)(4) and (5), which guarantee all mechanics access to information contained in the OBDs, render unlawful the anti-tampering regulations promulgated by California. Their interests in rebuilding and manufacturing replacement parts for the OBDs and the emissions systems that the devices monitor are related to the interests of mechanics who must access the information contained in the OBDs to determine whether any parts need to be repaired or replaced. Petitioners' "interests are [thus] sufficiently congruent with those of the [mechanics] that [petitioners are] not 'more likely to frustrate than to further the statutory objectives.' " First Nat'l Bank & Trust, 988 F.2d at 1275 (quoting Clarke, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12); see also Scheduled Airlines Traffic Offices, Inc. v. Department of Defense, 87 F.3d 1356, 1359 (D.C.Cir.1996).
 
 B. Mootness
 
 41
 Somewhat more persuasive is EPA's contention that the 1997 revision of California's OBDs regulations moot portions of petitioners' challenge to the waiver. California no longer requires manufacturers to "employ proven methods to deter unauthorized reprogramming which may include copyrightable executable routines or other methods." CAL.CODE REGS. tit. 13, § 1968.1(d) (1995). The state also eliminated the prospective requirement that "[b]eginning with the 1999 model year, manufacturers shall include enhanced tamper protection strategies including data encryption ... and write protect features requiring electronic access to an off-site computer maintained by the manufacturer." Id. However, California's regulations continue to require that "[c]omputercoded engine operating parameters shall not be changeable without the use of specialized tools and procedures (e.g., soldered or potted computer components or sealed (or soldered) computer enclosures)." CAL.CODE REGS. tit. 13, § 1968.1(d) (1997).
 
 
 42
 Guided by MEMA I's instruction that the court must not "ignore the public record of the CARB's amendments" lest it "in effect be deciding a hypothetical question," we conclude that petitioners' challenges based on the assumption that California's regulations would require access to an off-site computer for maintenance beginning with 1999 model-year cars are moot. MEMA I, 627 F.2d at 1104 n. 18. The elimination of that requirement constitutes "a fundamental change in the state of affairs" that has warranted resort by the court to the mootness doctrine in similar circumstances. Id.
 
 
 43
 Further, intervenor CARB contends that petitioners' entire challenge to the deemed-to-comply rule has become moot as a result of the changes in the California's regulations. "An action is moot when nothing turns on its outcome." Schering Corp. v. Shalala, 995 F.2d 1103, 1105 (D.C.Cir.1993). A dispute may be mooted when the allegedly illegal conduct at issue has been voluntarily discontinued if (1) there is no reasonable expectation that the conduct will recur and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); see also Reeve Aleutian Airways, Inc. v. United States, 889 F.2d 1139, 1142-43 (D.C.Cir.1989). The burden of establishing mootness rests on the party that raises the issue. Reeve Aleutian Airways, Inc., 889 F.2d at 1143. It is a "heavy" burden. Davis, 440 U.S. at 631, 99 S.Ct. at 1383.
 
 
 44
 We conclude that petitioners' challenge to the waiver rule is not entirely moot because two sources of alleged regulatory injury have not been addressed by the 1997 amendments. First, California's revised regulations still require "specialized tools and procedures" to access or change "computer coded engine operating parameters." CAL.CODE REGS. tit. 13, § 1968.1(d). A challenge to a portion of a regulation that is unaffected by intervening amendments does not become moot by reason of those amendments. The "[a]mendment[s] do[ ] not, however, eliminate the 'actual controversy' between the parties; [they] inform[ ] the decision." First Gibraltar FSB v. Morales, 42 F.3d 895, 898 (5th Cir.1995). Petitioners contend that the "specialized tools and procedures" requirement violates section 202(m), and that compliance with that subsection is a prerequisite to any waiver approval. Were the court to agree, it would follow that the 1997 revisions to California's OBD II regulations did not eradicate the effects of EPA's unlawful waiver.
 
 
 45
 Second, California has been certifying cars with OBD II systems since the 1994 model year. Until the 1997 revisions, each car sold with an OBD II system had to "employ proven methods to deter unauthorized reprogramming which may include copyrightable executable routines or other methods." CAL.CODE REGS. tit. 13, § 1968.1(d) (1995). These cars continue to carry OBDs equipped with methods to deter reprogramming, notwithstanding repeal of the requirements. If, as petitioners contend, the Clean Air Act requires both California and EPA to implement regulations barring the installation of any anti-tampering mechanisms in their OBDs, then the state unlawfully required manufacturers to install copyrightable routines designed to deter reprogramming over four model years. Were the court to agree with petitioners, the question would be whether they are entitled to access the information shielded by the encryption devices required by the state for cars built in those years. Cf. Atlantic Richfield Co. v. United States, 774 F.2d 1193, 1198 (D.C.Cir.1985).
 
 
 46
 Furthermore, EPA's interpretation of section 209(b)--specifically that the waiver provision does not require compliance with section 202(m)--is likely to affect its evaluation of all California waivers. Because petitioners maintain that the waiver process requires compliance with section 202(m), they are "more broadly ... attacking the standards" that the EPA applies in its review of waiver requests. Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth., 659 F.2d 168, 175 (D.C.Cir.1981). These standards have not been affected by the 1997 revisions.
 
 C. Timeliness
 
 47
 EPA also contends that petitioners' challenges to its deemed-to-comply rule are untimely, and its argument is not without some force. Appeals from final decisions made under the Clean Air Act must be filed within sixty days of the date of the decision's publication in the Federal Register. See CAA § 307(b), 42 U.S.C. § 7607(b) (Supp. V 1993).[11] This filing period is " 'jurisdictional in nature, and may not be enlarged or altered by the courts.' " Edison Elec. Inst. v. EPA, 996 F.2d 326, 331 (D.C.Cir.1993) (quoting NRDC v. NRC, 666 F.2d 595, 602 (D.C.Cir.1981)). This is not a case, however, where petitioners have barely missed a deadline. Rather, EPA contends that they should have challenged the agency's authority in two earlier rulemakings.
 
 
 48
 The agency first contends that petitioners' challenge to its authority to require anti-tampering devices should have been made when the agency initially promulgated its 1993 OBD regulations, which included a version of the deemed-to-comply rule and an interpretation of section 202(m)(4). See 58 Fed.Reg. at 9470-71, 9487. However, EPA's prior efforts to promulgate a deemed-to-comply rule were unsuccessful. EPA abandoned its 1993 version of the deemed-to-comply rule when it agreed to vacate its 1993 rule and asked for an order declaring the rule "void ab initio." Thus, insofar as petitioners are concerned, it is as though the 1993 rule never existed. EPA's next effort was the 1995 final rule. But in dismissing their appeal of the 1993 rule, aftermarket petitioners expressly reserved their right to challenge the 1995 rule. Their adverse comments on that rule prompted EPA to promulgate the 1996 rule that is the subject of this appeal.
 
 
 49
 As this chronology suggests, it would have been fruitless for petitioners to have appealed the 1995 rule at the very time that the agency was affirmatively responding to petitioners' comments. Had they filed such an appeal, the agency likely would have argued that it was not ripe or would have sought a remand or a stay in light of its then-present intention of modifying the rule in response to petitioners' comments. So viewed, it was not until EPA promulgated a revised final rule in 1996 that petitioners could have perfected an appeal, and they have done so.
 
 
 50
 Furthermore, the subjects covered by California's regulations, which EPA has deemed to comply with federal law, were revised between 1993, the first year that EPA promulgated an OBD regulation, and the deemed-to-comply rulemaking in the instant appeal. For example, California's earlier regulations required "reprogrammable computer code systems" to include "proven write-protect features which may include copyrightable executable routines or other methods." CAL.CODE REGS. tit. 13, § 1968.1(d) (1993). By the time California applied for a waiver, however, the write-protect requirement had been deleted from its regulations. See CAL.CODE REGS. tit. 13, § 1968.1(d) (1995). Its regulations have been revised further since 1995. Consequently, to some extent, the 1996 deemed-to-comply rule before the court is a different rule than the one promulgated in 1993, with different state regulations at stake. Cf. Office of Communication of the United Church of Christ v. FCC, 911 F.2d 813, 815-16 (D.C.Cir.1990); Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1385 (D.C.Cir.1996). EPA acknowledged as much when it updated the waiver of preemption that it awarded California in 1996. See California State Motor Vehicle Pollution Control Standards, 61 Fed.Reg. 53,371 (1996).
 
 
 51
 Accordingly, we conclude that EPA's unsuccessful prior efforts to promulgate a deemed-to-comply rule concerning a substantially different set of California regulations do not render petitioners' challenge to this rule untimely.
 
 
 52
 Second, EPA contends that petitioners should have challenged its discussion of section 202(m)(4) in the 1993 OBD rule. In that rule, the agency interpreted subsection (m)(4) to require OBD system information to be "unrestricted and accessible to anyone via standardized connectors without requiring access codes or any device only available from the manufacturer." 58 Fed.Reg. at 9471-72. EPA thus concluded that OBD systems had to "be accessible with the use of a standard hand-held diagnostic tool." Id. at 9472. EPA maintains that petitioners should have attempted to persuade it, at that point, to interpret subsection (m)(4) to preclude any regulation permitting manufacturers to install anti-tampering devices on their OBDs. Although the question is close, we conclude that this argument is also unconvincing. Any such challenge to the agency's interpretation of subsection (m)(4) regarding anti-tampering devices would not have been ripe for this court's review, since EPA agreed to an order declaring its anti-tampering regulations void before a challenge could be made. See Specialty Equip. Market Ass'n v. Browner, No. 93-1277 (D.C.Cir. May 19, 1994). Petitioners are not expected to challenge an agency's interpretation that has not been implemented by any regulation. See U.S. West, Inc. v. FCC, 778 F.2d 23, 27-28 (D.C.Cir.1985). "A time limitation on petitions for judicial review ... can run only against challenges ripe for review." Baltimore Gas & Elec. Co. v. ICC, 672 F.2d 146, 149 (D.C.Cir.1982). A challenge that would have been unripe if it had been brought earlier can hardly be characterized as untimely now.[12]
 
 
 53
 Similarly, EPA's third contention, that petitioners should have pursued their challenges when the agency promulgated the Service Information Rule in 1995, which implemented section 202(m)(5) of the CAA by "requir[ing] vehicle manufacturers to provide to the service and repair industry information necessary to service on-board diagnostic (OBD) systems and to perform other emission-related diagnosis and repair," 60 Fed.Reg. at 40474, is unpersuasive. As originally proposed, the Service Information Rule included an antitampering provision similar to California's. See 56 Fed.Reg. at 48,272, 48,276, 48,296. This provision was deleted following the stipulated court order vacating portions of the rule. EPA, however, continued to consider an anti-tampering policy and retained the discretion to promulgate new regulations in the future. See Control of Air Pollution from New Motor Vehicles, 60 Fed.Reg. 15,242, 15,245 (1991). But in the final version of the Service Information rule, "EPA ... decided not to require secured systems," based upon comments from petitioners and other interested parties. Thus, petitioners prevailed again. While the agency indicated that it "believe[d]" that manufacturers "should be allowed" to develop OBDs with encryption devices, 60 Fed.Reg. at 40,493, and also asserted that it had "authority" to require such devices in the future, such dicta could hardly be characterized as a portion of EPA's final rule. EPA did not promulgate an antitampering regulation. Had petitioners sued over the dicta then, their lawsuit would have been dismissed as unripe. See U.S. West, Inc., 778 F.2d at 27-28. "[T]he calendar does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content." RCA Global Communications, Inc. v. FCC, 758 F.2d 722, 730-31 (D.C.Cir.1985). Petitioners cannot reasonably be expected to have speculated then that this discussion of encryption meant that EPA would later interpret California's anti-tampering devices not to violate the Clean Air Act. As petitioners maintain, the issue of the agency's authority was not joined in the Service Information rulemaking itself because neither the proposed rule nor the terms of the final rule addressed what EPA might permit "voluntarily" in the future.
 
 
 54
 Undoubtedly, petitioners might have challenged the agency's authority from the beginning, as EPA suggests, but as the evolution of the 1996 deemed-to-comply rule demonstrates, there would have been no occasion to address their contentions until the instant appeal. The agency, confronted with a challenge to its authority, modified its proposed rule in response to petitioners' substantive concerns and thereby postponed confronting the issue of its authority.
 
 D. Exhaustion
 
 55
 We agree, however, that one of petitioners' contentions is not properly before the court. Petitioners contend that the deemed-to-comply rule "nationalizes" the "California car" because it changes the emissions standards that Congress set for the remaining forty-nine states. CAA section 202(b)(1)(C) provides that "[i]t is the intent of Congress that the numerical emission standards specified in" the Act "shall not be modified by the Administrator after November 15, 1990, for any model year before the model year 2004." CAA § 202(b)(1)(C), 42 U.S.C. § 7521(b)(1)(C). California's emissions standards are lower than those in the CAA. Compare CAL.CODE REGS. tit. 13, § 1960.1(f) & (g) (1997) with CAA 202(g), 42 U.S.C. § 7521(g). Consequently, if the EPA rule had the effect that manufacturers nationalized their California cars, petitioners contend, then the rule would change the emissions standards provided by Congress in contravention of the Act.
 
 
 56
 The CAA provides that "only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment ... may be raised during judicial review." CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B) (1988). The court enforces this provision "strictly," NRDC v. Thomas, 805 F.2d 410, 427 (D.C.Cir.1986), to ensure that EPA has an opportunity to respond to every challenge to the regulatory regime it administers. Consequently, the court enjoys the benefit of the agency's expertise and possibly avoids addressing some of the challenges unnecessarily. Petitioners did not cite section 202(b)(1)(C) in their comments to the agency. Although they argued that California had to act consistently "with CAA section 202," that section covers a number of areas, including national standards for emissions of carbon monoxide, hydrocarbons, and nitrogen oxides, see CAA § 202(g), 42 U.S.C. § 7521(g), cold start emissions standards, see CAA § 202(j), 42 U.S.C. § 7521(j), and provisions for a study of unregulated toxic air pollutants, see CAA § 202(l), 42 U.S.C. § 7521(l). Thus, petitioners' objection, based on a bare reference to section 202, can only fairly be characterized as unspecific. Cf. American Petroleum Inst. v. EPA, 52 F.3d 1113, 1119 (D.C.Cir.1995). While petitioners also argued that a "single onboard diagnostic system can be used nationally [but] it should be a system which meets the current federal requirements as mandated by Congress," the current federal requirements mandated by Congress cover the entire Clean Air Act. EPA could not reasonably evaluate petitioners' intricate section 202(b)(1)(C) argument in light of their vague reference to "federal requirements." Both prudence and judicial economy dictate that we reject petitioners' efforts here. Having failed in their generalities about federal standards to give the agency an opportunity to consider their specific concerns, petitioners cannot raise them for the first time now.
 
 III.
 
 57
 Turning to the merits, petitioners contend that California's anti-tampering provisions are illegal under § 202(m)(4) and (m)(5), and therefore EPA should not have granted the state a waiver. Additionally, petitioners maintain that EPA cannot itself adopt a deemed-to-comply rule that would allow manufacturers to meet federal standards while employing antitampering technology. They contend that subsections (m)(4) and (m)(5) taken both separately and in tandem affirmatively require unrestricted access to the OBDs. We conclude that EPA is not required to consider the mandates of subsections (m)(4) and (m)(5) in granting a waiver, and, in any event, nothing in either section prohibits California from adopting anti-tampering provisions. Thus, neither the waiver nor the deemed-to-comply rule were contrary to law.
 
 
 58
 A. Section 202(m) and the Waiver Requirement
 
 
 59
 Petitioners make a textual argument, relying on internal cross-references within section 202 in an effort to show that subsection (m)'s information and access requirements must be factored into the agency's determination whether to grant California's waiver application. There are several problems with their approach.
 
 
 60
 First, section 209(b) sets forth the only waiver standards with which California must comply. California must conclude that its standards "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards" to obtain a waiver. CAA § 209(b)(1), 42 U.S.C. § 7543(b)(1). EPA then must conclude that the state's standards were not promulgated in an arbitrary and capricious fashion, that the state needs its standards "to meet compelling and extraordinary conditions," and that the state's standards are consistent with section 202(a). See id. If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application. The test makes no reference to section 202(m).
 
 
 61
 Petitioners do not contend that California's OBD II regulations directly violated section 202(a), which establishes the general authority of the EPA Administrator to prescribe federal emissions standards by regulation. See CAA § 202(a), 42 U.S.C. § 7521(a). In the waiver context, section 202(a) "relates in relevant part to technological feasibility and to federal certification requirements." Ford Motor Co. v. EPA, 606 F.2d 1293, 1296 n. 17 (D.C.Cir.1979); see also MEMA I, 627 F.2d at 1101, 1111. The "technological feasibility" component of section 202(a) obligates California to allow sufficient lead time to permit manufacturers to develop and apply the necessary technology.[13] See American Motors Corp. v. Blum, 603 F.2d 978, 981 (D.C.Cir.1979). The federal certification component ensures that the Federal and California test procedures do not "impose inconsistent certification requirements." Waiver of Federal Preemption, 46 Fed.Reg. 26,371, 26,372 (1981). Neither the court nor the agency has ever interpreted compliance with section 202(a) to require more. See, e.g., MEMA I, 627 F.2d at 1101, 1111; Ford Motor Co., 606 F.2d at 1296 n. 17; American Motors Corp., 603 F.2d at 981; Waiver of Federal Preemption, 46 Fed.Reg. at 26372.
 
 
 62
 Second, the agency's long-standing interpretation and the legislative history run counter to petitioners' contention that to obtain a waiver California must also comply with section 202(m) because sections 202(a) and 202(m) cross-reference each other. Under subsection (a), the EPA Administrator is required to prescribe and revise regulations "in accordance with the provisions of this section," including, in petitioners' view, subsection (m). Id. § 7521(a)(1). Subsection (m) similarly provides that the agency must "promulgate regulations under subsection (a) of this section" implementing Congress' OBD provisions. Id. § 7521(m)(1). Although statutory cross-referencing presents a superficially plausible textual argument linking compliance with subsection (m) to compliance with subsection (a), the agency has long interpreted the statute to give California very broad authority, and the court has held that this interpretation is not unreasonable. Cf. Ford Motor Co., 606 F.2d at 1297 (observing that Congress had permitted California to adopt different specific emissions requirements than those provided in the CAA). It is also contrary to the legislative history of the waiver provision emphasizing that California is to have the "broadest possible discretion in selecting the best means to protect the health of its citizens." H.R.REP. NO. 95-294, at 301-02, quoted in MEMA I, 627 F.2d at 1110. As the provisions of section 209(b) make clear, Congress has also provided that EPA "is not to overturn California's judgment lightly." H.R.REP. NO. 95-294, at 302, quoted in MEMA I, 627 F.2d at 1123 n. 54. "In short, Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight." Ford Motor Co., 606 F.2d at 1297; see also Engine Mfrs. Ass'n, 88 F.3d at 1080.
 
 
 63
 The agency's longstanding interpretation that section 209(b) does not require California to establish perfect compliance with the CAA to obtain a waiver is particularly plausible because section 209(b) explicitly requires on that the state's standards "be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." CAA § 209(b)(1), 42 U.S.C. § 7543(b)(1). Petitioners make no claim that California's OBD standards do not satisfy this requirement. They instead limit their arguments under section 209(b) to whether California's standards are consistent with section 202(a). But section 209(b)(1) makes clear that section 202(a) does not require, through its cross-referencing, consistency with each federal requirement in the act. California's consistency is to be evaluated "in the aggregate," rather than on a one-to-one basis. CAA § 209(b)(1), 42 U.S.C. § 7543(b)(1).
 
 
 64
 Third, it would appear virtually impossible for California to exercise broad discretion if it had to comply with every subsection of section 202 that cross-referenced subsection (a). See, e.g., CAA § 202(b), (g), (h), (j), (m)(1), (m)(2), (m)(4), 42 U.S.C. § 7521(b), (g), (h), (j), (m)(1), (m)(2), (m)(4). For example, under CAA § 202(g), 42 U.S.C. § 7521(g), EPA has observed, "California would not be denied a waiver if its CO standard were slightly higher than the federal ... standard.... This is despite the fact that section 202(g) contains specific standards for CO that EPA must promulgate." EPA Air Docket A-90-28, Doc. No. V-B-1 at 47. Requiring California to meet the standards of each subsection of section 202 would eviscerate much of the flexibility of the waiver program, in contravention of Congress' purpose in creating it, as EPA's traditional interpretation and decisions by this court have recognized. Congress created the waiver provision so that "California could enforce emission control standards which it determined to be in its own best interest even if those standards were in some respects less stringent than comparable federal ones." Ford Motor Co., 606 F.2d at 1301.
 
 
 65
 It is true that, in addition to the lead-time and technological feasibility requirements set forth in section 202(a), California must not arbitrarily and capriciously conclude that its standards are "at least as protective of health and welfare as applicable Federal standards." CAA § 209(b)(1), (2), 42 U.S.C. § 7542(b)(1), (2). Conceivably this requirement could lead the EPA to examine the state's application in light of section 202(m) in addition to the other substantive requirements of the Clean Air Act. But the state is not required to establish a one-to-one correspondence with the federal standards set forth in section 202(m) to obtain its waiver.[14] See Ford Motor Co., 606 F.2d at 1297.
 
 B. Section 202(m) Compliance
 
 66
 Nevertheless, we must consider whether California's OBD II regulations comply with section 202(m) for two reasons. First, in recognition of the serious consequences that would follow if California's regulations did not comply with section 202(m), the agency considered whether California's OBD II standards met the section's requirements in evaluating its waiver application. See EPA Air Docket A-90-28, No. V-B-1. EPA did so because
 
 
 67
 section 202(m)(4) and (5) were [sic] designed to allow the aftermarket to receive information that Congress believed was necessary for aftermarket repair and diagnosis. If California's regulations are, as aftermarket commentators suggest, clearly contrary to the intent of Congress, then EPA's granting of a waiver to California would effectively eliminate this key Congressional provision in California (and any other state that enacts California's regulations through section 177). Given the substantial implications of this, EPA must tread carefully.
 
 
 68
 Id. at 47. Second, EPA was obligated to determine whether California's OBD II regulations complied with section 202(m) when it promulgated its deemed-to-comply rule. By making those regulations a federal option, the agency was required to evaluate whether they met the statutory requirements for federal regulations. Hence, the court is not confronted with a situation in which, by means of the California waiver and section 177's provision allowing other states to opt into the California system, the protections provided by subsections (m)(4) and (5) would be eliminated by widespread adoption of California's rules. See CAA § 177(1), 42 U.S.C. § 7507(1).
 
 
 69
 Petitioners contend that California's OBD II regulations violate section 202(m)(5)'s requirement that automobile manufacturers must make available "any and all information needed to make use of the emission control diagnostics system." CAA 202(m)(5), 42 U.S.C. § 7521(m)(5). They maintain that subsection (m)(5) requires California and EPA to adopt regulations that divulge all the information contained on OBD chips, perhaps because doing so would ease the task of their members, who manufacture replacement parts, to make their own versions of the chips and compatible OBD components. But as subsection (m)(5) makes clear, only "person[s] engaged in the repairing or servicing of motor vehicles or motor vehicle engines" are entitled to "information needed to make use of the" OBDs. CAA § 202(m)(5), 42 U.S.C. § 7521(m)(5). The plain language of the statute therefore establishes that subsection (m)(5) does not entitle aftermarket manufacturers to the information needed to make replacement OBD parts. EPA has accordingly concluded that the term "information needed" refers to information that mechanics can use to repair automobiles, and that the availability of such information is not precluded by California's anti-tampering regulations. EPA explained that "[s]ection 202(m)(5) is designed solely to make sure that manufacturers provide aftermarket repair personnel with the same emission-related repair and diagnostic information that they provide to their dealers.... Availability of such information is not prevented by California's anti-tampering provisions." EPA Air Docket A-90-28, No. V-B-1 at 61 (emphasis in original).
 
 
 70
 Although the plain language of section 202(m)(5) does not make clear exactly what information independent mechanics do need to service OBDs, it is possible to interpret subsection (m)(5) to require access to all the information about OBDs that is otherwise hidden by anti-tampering devices, as petitioners urge. CAA § 202(m)(5), 42 U.S.C. § 7521(m)(5). To the extent that the precise contours of the type of information about OBDs that automobile manufacturers are required to turn over to independent service providers under subsection 202(m)(5) is not set forth, the statute is ambiguous. Because of this ambiguity, we evaluate EPA's interpretation limiting the amount of information available to service providers in light of the second step of the familiar Chevron analysis, which requires the court to defer to the agency's reasonable interpretation of the CAA. See Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).
 
 
 71
 We conclude that EPA's interpretation of subsection (m)(5) reasonably comports not only with the statute's discussion of "information needed," but also with its protection of the trade secrets of automobile manufacturers. Easy access to the computer programs underlying the OBDs and protected by anti-tampering devices would make protection of the intellectual property contained therein difficult, without making the servicing of vehicles containing OBDs any easier. See 60 Fed.Reg. at 40,492. Congress sought to balance the need of all mechanics for information from the devices, thereby preserving competition with service and repair shops unaffiliated with manufacturers, with the right of those manufacturers to protect their trade secrets, promoting further innovation in OBD technology. See, e.g., 136 CONG. REC. 5391-92 (1990) (Statements of Sens. Baucus, Chafee, and Gore). Subsection (m)(5) therefore requires manufacturers to turn over service information, but not trade secrets, to independent mechanics. See CAA § 202(m)(5), 42 U.S.C. § 7521(m)(5). EPA was consequently obligated to strike such a balance in implementing the subsection, and there is no record evidence that the chip protections and write-protect encryption adopted in California's OBD II regulations prevent mechanics from obtaining the information they need from the devices to make repairs.[15] Under such circumstances we defer to EPA's conclusion that California's regulations maintain, rather than upset, that balance.
 
 
 72
 Petitioners' contentions regarding section 202(m)(4) are also unpersuasive. That subsection requires, among other things, that "access to the emission control diagnostics system" be "unrestricted and shall not require any access code" and that "the output of the data from the emission control diagnostics system be usable without the need for any unique decoding information or device." CAA § 202(m)(4)(B-C); 42 U.S.C. § 7521(m)(4)(B-C). Petitioners contend that the subsection affirmatively requires unrestricted access to all of the information contained in OBDs. But the statute only requires easy access to the OBDs for the purposes of "inspection, diagnosis, service, or repair." CAA § 202(m)(4)(A), 42 U.S.C. § 7521(m)(4)(A). As EPA explained, "the intent of section 202(m)(4) is that the information received by the emission control diagnostics portion of the OBD system concerning emission-related deterioration and malfunction be readily available to independent technicians.... [S]ection 202(m)(4) was not intended to require proprietary information, like internal computer codes, to be subject to unlimited access through the standard data connecters." EPA Air Docket A-90-28, No. V-B-1 at 61. While the soldering or potting of chips contemplated by the California regulations may make the chips difficult to extract and copy or reprogram, petitioners have presented no evidence that they prevent the faults identified by the OBDs from being accessed by a mechanic. As EPA explained in its waiver determination, "California's requirement for potting computers ... [has] little to do with the 'access to the emission control diagnostics system' that is protected by section 202(m)(4)(B)." Id. To the extent that the subsection's guarantees include ambiguous terms such as "access" and "usable" "output," we defer to the agency's reasonable interpretation of those terms. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82.
 
 IV.
 
 73
 Petitioners further contend that section 207's warranty provisions invalidate California's anti-tampering regulations. Section 207 requires all "manufacturer[s] of each new motor vehicle and new motor vehicle engine [to] warrant to the ultimate purchaser and each subsequent purchaser" of an automobile that the automobile complies with section 202 of the Act. CAA § 207(a)(1), 42 U.S.C. § 7541(a)(1) (1988). Congress has taken steps to prevent manufacturers from creating parts and service monopolies through their emissions warranty programs. Pursuant to section 207(b), "if a vehicle owner [has] installed a certified aftermarket part, the vehicle manufacturer" cannot "refuse to honor the owner's warranty repair claim."[16] Automotive Parts Rebuilders Ass'n v. EPA, 720 F.2d 142, 158 (D.C.Cir.1983). Similarly, under section 207(c), a manufacturer may not condition its warranty on service by a mechanic affiliated with the manufacturer.[17] See id. at 159 n. 68. Petitioners contend that California's antitampering provisions contradict these protections by effectively preventing the use of aftermarket replacement chips.
 
 
 74
 Petitioners appear, however, to misperceive the legal link between section 207 and section 209, which sets forth the standards that EPA must apply to California's waiver applications. Although EPA "must be sensitive to the anti-competitive concerns Congress expressed in" section 207, it "has no obligation under section 209(b) to guarantee that California's regulations are without anticompetitive implications." MEMA v. EPA (MEMA II), 627 F.2d 1128, 1131 (D.C.Cir.1979). California is not required to comply with section 207 to obtain a waiver, see CAA § 209(b), 42 U.S.C. § 7543(b), and, as noted, the agency may not evaluate California's waiver application "based on factors other than those Congress expressly or impliedly intended the agency to consider." MEMA I, 627 F.2d at 1116.
 
 V.
 
 75
 Finally, petitioners contend that EPA failed to comply with two statutory provisions requiring the analysis of the effects of a proposed rule on certain small entities such as businesses.
 
 
 76
 On neither can petitioners prevail. First, petitioners contend that EPA failed to comply with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-12 (1988), when it promulgated its deemed-to-comply rule. The RFA requires that an agency conduct a regulatory flexibility analysis for any rule that will have a "significant economic impact on a substantial number of small entities." Id. § 605(b). "[I]n an appropriate case, [a court may] strike down a rule because of a defect in the flexibility analysis." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 538 (D.C.Cir.1983). This is not an appropriate case. There is nothing to indicate any defect in EPA's compliance with the statute.
 
 
 77
 EPA concluded when it promulgated its final rule that, "[t]his rule will not have a significant adverse economic impact on a substantial number of small businesses" and, therefore, did not conduct a regulatory flexibility analysis on those entities. 61 Fed.Reg. at 45,902. The RFA does not contemplate an analysis in such situations. See 5 U.S.C. § 605(b). While EPA only considered whether its deemed-to-comply rule would have "a substantial impact" on "large and small volume automobile manufacturers," id., it was not obliged to conduct a regulatory flexibility analysis for any other business, including the businesses represented by petitioners. An agency is under "no obligation to conduct a small entity impact analysis of effects on entities which it does not regulate."[18] United Distribution Cos. v. FERC, 88 F.3d 1105, 1170 (D.C.Cir.1996); see also Mid-Tex Elec. Co-op, Inc. v. FERC, 773 F.2d 327, 342 (D.C.Cir.1985). Because the deemed-to-comply rule did not subject any aftermarket businesses to regulation, EPA was not required to conduct a flexibility analysis as to small aftermarket businesses. It was only obliged to consider the impact of the rule on small automobile manufacturers subject to the rule, and it met that obligation.
 
 
 78
 Second, petitioners contend that EPA failed to comply with section 317(c)(3) of the Clean Air Act, which requires the agency to conduct an analysis of "the effects on competition of the standard or regulation with respect to small business." CAA § 317(c)(3), 42 U.S.C. § 7617(c)(3) (1988). Section 317 also provides, however, that "[n]othing in this section shall be construed ... to authorize or require any judicial review of any such standard or regulation, or any stay or injunction of the proposal, promulgation, or effectiveness of such standard or regulation on the basis of failure to comply with this section." CAA § 317(e)(3), 42 U.S.C. § 7617(e)(3); see also MEMA I, 627 F.2d at 1116. Therefore, the court is without jurisdiction to evaluate petitioners' section 317(c)(3) contention.
 
 
 79
 Accordingly, we dismiss so much of the petitions as are moot as a result of the 1997 revisions to California's regulations and as are not properly before the court, and we deny the remaining portions of the petitions.
 
 
 
 [1]
 Motor vehicles are a significant source of carbon monoxide ("CO"), nitrogen oxide ("NO subx "), volatile organic compounds ("VOCs"), and other toxic air pollutants regulated under the Act. See Inspection/Maintenance Program Requirements, 57 Fed.Reg. 52,950, 52,981 (1992) (codified at 40 C.F.R. pt. 51). See generally Arnold W. Reitze, Jr. & Barry Needleman, Control of Air Pollution from Mobile Sources through Inspection and Maintenance Programs, 30 HARV. J. ON LEGIS . 409, 410-414, 448-49 (1993)
 
 
 [2]
 See S.Rep. No. 101-228, at 97 (1990), reprinted in 1990 U.S.C.C.A.N. 3385, 3482
 
 
 [3]
 See S.Rep. No. 101-228, at 97, reprinted in 1990 U.S.C.C.A.N. at 3482
 
 
 [4]
 See id
 
 
 [5]
 S.Rep. No. 101-228, at 97, reprinted in 1990 U.S.C.C.A.N. at 3482
 
 
 [6]
 S.Rep. No. 101-228, at 98, reprinted in 1990 U.S.C.C.A.N. at 3483
 
 
 [7]
 See S.Rep. No. 101-228 at 97, reprinted in 1990 U.S.C.C.A.N. 3385, 3482
 
 
 [8]
 CARB, REVISIONS TO MALFUNCTION AND DIAGNOSTIC SYSTEM REQUIREMENTS APPLICABLE TO 1994 AND LATER NEW CALIFORNIA PASSENGER CARS, LIGHT-DUTY TRUCKS, AND MEDIUM-DUTY VEHICLES WITH FEEDBACK FUEL CONTROL SYSTEMS 21 (1989) (hereinafter "CARB Report")
 
 
 [9]
 The agency had issued an earlier "notice of decision", which outlined the challenge to the agency's anti-tampering regulations, described the settlement, and announced that the federal anti-tampering regulations and deemed-to-comply rule had been declared void, pending a new rulemaking by the agency. Notice of Court Decision, 59 Fed.Reg. 51,114 (1994)
 
 
 [10]
 See Control of Air Pollution From New Motor Vehicles, 60 Fed.Reg. 37,945, 37,945 (1995)
 
 
 [11]
 The statute also provides a sixty day period in which to file claims based on grounds arising after the initial sixty day period has expired. See CAA § 307(b), 42 U.S.C. 7607(b) (Supp. V 1993)
 
 
 [12]
 EPA's discussion of section 202(m)(4) in its response to comments on the Service Information Rule was similarly ambiguous. There, the agency intimated that it did not "believe" that section 202(m)(4) required "internal computer codes" or "reprogramming information" to be provided to independent technicians. But this "belief" hardly constituted the stuff of which petitioners could have sought review
 
 
 [13]
 EPA has explained that it must deny a waiver for California if the state's regulations provide "inadequate lead time to permit the development of the technology necessary to implement the new procedures, giving appropriate consideration to the cost of compliance within the time frame." Waiver of Federal Preemption, 46 Fed.Reg. 26,371, 26,372 (1981)
 
 
 [14]
 Petitioners' reliance on American Motors Corp., 603 F.2d at 981, is misplaced. In that case, EPA viewed the petitioner's complaint about the lead time for a proposed action by CARB to be solely based on section 202(b), not section 202(a), and so was not cognizable in the waiver process. The court disagreed, observing that the lead time for implementation of the NO subx standard was governed by section 202(a)(2) and concluding that "the California regulation, which denies to [petitioner] a lead time of two years, is inconsistent with" section 202(a)(2). Id. at 981. Thus, the American Motors decision did not suggest that all of the subsections of section 202 were incorporated into subsection (a) for the purposes of assessing a California waiver application. Instead, it concluded that the EPA had granted a waiver without determining whether California had met the standards of section 202(a)
 
 
 [15]
 EPA reports that it "has received no information [indicating] that this information is needed by repair personnel to repair vehicles.... [T]here have been many comments indicating that service people have no use for such underlying information and would likely not know how to use it if they had access to it." 60 Fed.Reg. at 40,492
 
 
 [16]
 Section 207(b) provides that the manufacturer may not invalidate any warranty "on the basis of any part used in the maintenance or repair of a vehicle or engine." See CAA § 207(b)(2), 42 U.S.C. § 7541(b)(2)
 
 
 [17]
 Section 207(c) provides that a manufacturer generally may not condition its warranty on a requirement that the automobile be serviced "by the franchised dealers of such manufacturer or any other service establishments with which such manufacturer has a commercial relationship" as opposed to "service performed by independent automotive repair facilities with which such manufacturer has no commercial relationship." CAA § 207(c)(3)(B), 42 U.S.C. § 7541(c)(3)(B)
 
 
 [18]
 The RFA itself distinguishes between small entities subject to an agency rule, to which its requirements apply, and those not subject to the rule, to which the requirements do not apply. For example, the RFA only requires that the initial analysis contain information on "small entities to which the proposed rule will apply" and "small entities which will be subject to the requirement" of the rule in question. 5 U.S.C. § 603(b)