### The **KIDNEY CENTER OF HOLLYWOOD, et al.,** Appellants,

v.

### **Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Appellee.**

### No. 96–5074.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 2, 1997.

Decided Jan. 20, 1998.

Eugene A. Massey, Washington, DC, argued the cause for appellant, with whom Richard J. Webber was on the briefs.

Janice L. Hoffman, Attorney, U.S. Department of Health & Human Services, Baltimore, MD, argued the cause for appellee,

with whom Frank W. Hunger, Assistant Attorney General, U.S. Department of Justice, Eric H. Holder, Jr., U.S. Attorney at the time the brief was filed, Harriet S. Rabb, General Counsel, U.S. Department of Health & Human Services, Robert P. Jaye, Acting Associate General Counsel, Henry R. Goldberg, Deputy Associate General Counsel, Washington, DC, and Thomas W. Coons, Attorney, Baltimore, MD, were on the brief.

Before: WALD, WILLIAMS, and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The ten appellants in this case provide outpatient kidney dialysis services to patients who are suffering from end-stage renal disease, or ESRD. They dispute the amount of money to which they are entitled from the Secretary of Health and Human Services as reimbursement for medical services rendered under the Medicare program. Specifically, the appellants challenge (1) the Secretary's decision that the merger of their parent company with another corporation was a related-party transaction, such that certain costs associated with the merger were not reimbursable under Medicare; and (2) the regulation capping reimbursement for "bad debts" at a provider's actual cost of providing dialysis service, which they claim is inconsistent with the statutory requirement that Medicare reimburse each dialysis provider in a prospectively set amount.

The district court upheld the Secretary's decision with respect both to the merger transaction and to the bad debt regulation. We agree with the district court that the merger was a related-party transaction. We reverse the district court, however, with respect to the validity of the bad debt regulation because we cannot tell, upon the present record, whether the regulation is based upon a reasonable interpretation of the Medicare statute. Therefore we vacate the rule and remand this matter for the Secretary to provide a more adequate explanation of her rationale for the rule.

## I. Background

Under the Medicare program the Secretary reimburses providers of ESRD dialysis services at 80% of a prospectively set rate and the Medicare beneficiary is responsible for the remaining 20% as a co-payment. See 42 U.S.C. § 1395rr(b)(2)(A); 42 C.F.R. § 413.170(b)(1), (d) (1996).[1] If, after making reasonable collection efforts, the provider is unable to collect the 20% co-payment, then the uncollected amount is considered a "bad debt." 42 C.F.R. § 413.80(b)(1), (e). At the end of the year the Secretary reimburses the dialysis provider for bad debts, but she caps total reimbursement per treatment at the particular provider's cost of providing the service. Id. § 413.170(e)(1).

During the relevant time period (1984–85) National Medical Care, Inc. owned, either directly or through a subsidiary, the ten dialysis providers that press this appeal. NMC itself changed ownership during that period, and the NMC subsidiaries reported, as reimbursable Medicare costs, certain costs associated with the acquisition of their parent company. If those costs are allowable, then the effect will be to increase those providers' bad debt cap. The Secretary disallowed the merger-related costs, however, on the ground that the merger was between related entities. The NMC subsidiaries then filed this lawsuit challenging both that determination and the regulation providing for the cap upon reimbursement of bad debts.

---

1. After the parties had briefed this case the Secretary amended and re-numbered some of the relevant regulations. See Medicare Program; End–Stage Renal Disease (ESRD) Payment Exception Requests and Organ Procurement Costs, 62 Fed.Reg. 43,657, 43,668–69 (1997). During the fiscal year at issue, 1985, the regulation challenged here was codified at § 405.439(e)(1); it is currently codified at § 413.170(e)(1), and pursuant to the 1997 amendments will be codified as amended at § 413.178(a). The 1997 amendments also changed the numbers of the following sections cited in this opinion: § 413.170(b)(1) will be codified as amended at § 413.172(a), and § 413.170(d) will be codified at § 413.176. At the time of the release of this opinion, title 42 of the 1997 Code of Federal Regulations had not been released. Accordingly, the court will cite to the 1996 version of the regulations (or an earlier version if appropriate).

A. Statutory and Regulatory Background

The Congress established the ESRD program in § 299I of the Social Security Amendments of 1972, Pub.L. No. 92–603, 86 Stat. 1329, 1463–64, by extending Medicare coverage to patients who have permanent kidney failure and require either dialysis or a kidney transplant. *See Medicare Programs; End–Stage Renal Disease Program; Prospective Reimbursement for Dialysis Services,* 47 Fed.Reg. 6,556, 6,556–57 (1982) (history of ESRD program). Medicare Part A, 42 U.S.C. §§ 1395c to 1395i–4, covers inpatient dialysis services provided by hospitals, while Medicare Part B, 42 U.S.C. §§ 1395j to 1395w–4, covers outpatient dialysis treatments by hospital-based and independent providers (such as NMC).

Under the Part B reimbursement system in place before 1983 the Secretary paid an independent provider of outpatient services 80% of the provider's "reasonable charge" (up to $138 per treatment). *See* 42 C.F.R. pt. 405, subpt. E (1982); 47 Fed.Reg. at 6,557. The Secretary paid an outpatient hospital-based provider 80% of the "reasonable cost" per treatment (also subject to a maximum of $138). *See* 42 C.F.R. pt. 405, subpt. D (1982); 47 Fed.Reg. at 6,557. The Medicare beneficiary was responsible for the remaining 20%. *See* 47 Fed.Reg. at 6,557.

Medicare also treated independent providers and hospital-based providers differently for the purpose of reimbursing "bad debts" run up by patients who did not pay their 20% share. Medicare reimbursed hospital-based facilities for bad debts as part of the reasonable cost reimbursement system. *See* 42 C.F.R. § 405.420 (1982); 47 Fed.Reg. at 6,568. The Secretary expected independent providers, however, "to absorb bad debts within the level of their charges." 47 Fed. Reg. at 6,568.

The cost of the ESRD program rose significantly in the 1970s. *Id.* at 6,556. In order to contain that cost the Congress passed the ESRD Program Amendments of 1978, Pub.L. No. 95–292, 92 Stat. 307 (codified as amended in scattered sections of 42 U.S.C.), in which it directed the Secretary to prescribe by regulation methods and procedures to "determine the costs incurred" by ESRD facilities, and to "determine, on a cost-related basis or other economical and equitable basis ... the amounts of payments to be made" for dialysis services. 42 U.S.C. § 1395rr(b)(2)(B). The second sentence of this new provision (which was deleted in 1981), required that the new regulations provide incentives for cost reduction and set either prospective or target rates. *See* Pub.L. No. 95–292, § 2, 92 Stat. at 309.

In 1980 the Secretary proposed to adopt a prospectively determined reimbursement rate, which the provider "would retain, even if its costs were below that rate." *Medicare Program; Incentive Reimbursement for Outpatient Dialysis and Self–Care Dialysis Training,* 45 Fed.Reg. 64,008, 64,009 (1980). The Secretary rejected the "target rate" approach under which there would be a "retroactive adjustment" to the prospective rate at the end of the year so that the Government and the provider would share in any cost savings. The Secretary believed that this approach would not have the same incentive for cost reduction as a prospectively set rate. *Id.*

In the 1980 proposal the Secretary opined that it was "appropriate to reimburse the facility for Medicare bad debts," *id.* at 64,010, and considered two options for doing so. The first was to "allow for the payment of bad debts written off during the year in a special payment at the end of the year." The second option was not to "allow a specific write-off of bad debts" but to "include an allowance for bad debts in the dialysis charge and the calculation of the [prospective] rate." The Secretary chose the former option because it "would permit [her] to pay each facility the exact amount of its bad debts." Accordingly the 1980 proposal did not cap the amount of bad debt that could be reimbursed per treatment.

Before the Secretary had issued a final rule implementing the 1978 amendments, however, the Congress amended the statute again, *see* Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 2145, 95 Stat. 357, 799–800 (codified at 42 U.S.C. § 1395rr), requiring the Secretary to adopt a prospective payment system. *See* 42 U.S.C.

§ 1395rr(b)(7). The Congress also modified sub-paragraph (b)(2)(B) of 42 U.S.C. § 1395rr by deleting the option of target rates and the requirement that the Secretary promulgate regulations to implement "appropriate incentives" for efficiency. As amended this subsection reads:

> The Secretary shall prescribe in regulations any methods and procedures to (i) determine the costs incurred by providers of services and renal dialysis facilities in furnishing covered services to individuals determined to have end-stage renal disease, and (ii) determine, on a cost-related basis or other economical and equitable basis (including any basis authorized under section 1395x(v) of this title) and consistent with any regulations promulgated under paragraph (7), the amounts of payments to be made for part B services furnished by such providers and facilities to such individuals.

The section to which reference is made defines "reasonable costs" as the "costs actually incurred" in providing services; it also prohibits "cross-subsidization" by requiring that the Secretary

> take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance program[ ].

42 U.S.C. § 1395x(v)(1)(A).

In the wake of the 1981 amendments the Secretary issued another notice of proposed rulemaking, in which she said that her

> basic approach is to identify the legitimate costs of what appear to be economically and efficiently operated dialysis facilities and then, in setting the rates, to make adjustments to reflect costs or savings attributable to operation as a hospital-based facility or as an independent facility.

47 Fed.Reg. at 6,563. Hence the Secretary audited a sample of dialysis providers, identified the median cost per treatment, and proposed that the prospective reimbursement

rate be based upon a composite figure reflecting the cost of both in-facility treatment (for hospital-based and independent facilities) and home dialysis. *Id.* at 6,561–64.

With respect to bad debts, in contrast, the Secretary proposed to reimburse both hospital-based and independent facilities retrospectively, but to cap the reimbursement at each provider's allowable costs. *Id.* at 6,568. Apparently the Secretary believed that the cap upon bad debt reimbursement was required by the prohibition of cross-subsidization:

> Since, under Part A of the Medicare program, costs of covered services furnished beneficiaries are not to be borne by individuals not covered by Medicare, the program will pay that part of uncollectible deductible and coinsurance amounts that brings the total of a provider's reimbursement up to the costs of these services. Conversely, since the statute requires that the program pay only for the costs of services related to care of beneficiaries, reimbursement for bad debts is limited in that we will not pay any amounts that would result in total reimbursement exceeding a provider's Medicare reasonable costs. . . . We considered, and discussed in the 1980 NPRM, the possibility of including an amount for bad debts in the rate, but have decided against it. Instead, we plan to pay all dialysis facilities 100 percent of allowable Medicare bad debts, up to their reasonable costs, in a separate payment at the end of each facility's cost accounting period.

*Id.*

The Secretary adopted the proposed rule with only minor changes not here relevant. *See Medicare Program; End–Stage Renal Disease Program; Prospective Reimbursement for Dialysis Services and Approval of Special Purpose Renal Dialysis Facilities,* 48 Fed.Reg. 21,254 (1983). The bad debt reimbursement provision, which the appellants now challenge, stated:

> HCFA will reimburse each facility its allowable Medicare bad debts, up to the facility's costs as determined under Medi-

care principles, in a single lump sum at the end of the facility's cost reporting period. *Id.* at 21,278 (currently codified at 42 C.F.R. § 413.170(e)(1) (1996)). In the preamble to the Final Rule the Secretary justified the cap upon reimbursement for bad debts, as she had in the 1982 NPRM, solely by reference to the statutory prohibition of cross-subsidization. 48 Fed.Reg. at 21,273. The Secretary also clarified the process by which bad debts will be reimbursed: the Secretary subtracts the provider's revenue, including both the 80% payment and any co-payment or deductible actually collected, from its reasonable cost, in order to determine the provider's "unrecovered costs." If the provider has made reasonable efforts to recover these amounts, then the program pays the lesser of the provider's unrecovered costs or the amount of the uncollected coinsurance and deductible.

### B. The Transaction

In April 1984 NMC entered into negotiations with W.R. Grace & Co. regarding the possibility of Grace's acquiring NMC through an exchange of stock. Eventually the parties agreed to structure the transaction as a leveraged buy-out. The parties met on July 23 to negotiate the terms of such a deal in which Grace and certain members of NMC's management would participate. These so-called "Management Investors" included Dr. Constantine L. Hampers, Chairman and CEO, as well as certain senior officers and directors.

When the parties had tentatively agreed upon a price of $19.50 per share of NMC, Dr. Hampers presented the transaction to NMC's board of directors. The board instructed Dr. Hampers to continue negotiations and appointed a committee of independent directors to evaluate the proposal and to make a recommendation to the full board. The independent directors retained their own legal counsel and investment bankers.

In August the parties agreed to a final price of $19.25 per share. After obtaining various changes to the form of the transaction the independent directors recommended the merger to the full NMC board, which approved, as did the shareholders of NMC.

Pursuant to the merger agreement, NMC (called "Old NMC") was acquired through the use of two newly formed entities, NMC Holding Corporation and its wholly owned subsidiary, NMC Acquisition Corporation. In December 1984 Old NMC was first acquired by and then merged with NMC Acquisition. The resulting company in turn merged with NMC Holding in June 1985 and the surviving corporation changed its name to National Medical Care, Inc. ("New NMC"). By January 1990, five years after the merger, Grace had acquired all of the shares of New NMC.

At its formation in 1984 the voting securities of NMC Holding were owned 49.99% by Grace, 37.20% by the Management Investors, and 12.81% by the so-called Physicians Group, which was made up of medical directors of NMC's dialysis facilities. Grace received options permitting it to purchase additional shares sufficient to give it 65% of the voting securities. Most of the money NMC Holding used to buy Old NMC came from bank borrowings ($315 million) and from the sale of NMC Holding stock to Grace ($65 million), with the Management Investors contributing only about $2 million through the purchase of NMC Holding stock. The Management Investors and Grace could each chose four of the eight directors of NMC Holding. Several officers and directors of Old NMC occupied the same positions with NMC Holding.

### C. Procedural History

For fiscal year 1985 the NMC providers claimed as allowable Medicare costs certain expenses relating to the transaction between Old NMC and NMC Holdings, including depreciation of tangible assets, amortization of intangible assets, and interest for financing the purchase of these assets. The fiscal intermediary, a private entity that the Secretary engages to determine the amounts payable to Medicare providers, *see* 42 U.S.C. § 1395h, disallowed some of these costs.

The NMC providers appealed that decision to the Provider Reimbursement Review Board. The PRRB held that the two-step merger between Old NMC and NMC Holding did not involve related entities and that

most of the expenses the NMC providers incurred in connection with the merger were therefore reimbursable. Upon further appeal the Administrator of the HCFA, acting on behalf of the Secretary, held that the merger was between related parties and therefore disallowed all relevant costs.

The NMC providers filed suit in the district court challenging the regulation capping reimbursement for bad debts and the Secretary's final decision that Old NMC and NMC Holding were related entities. The court granted the Secretary's and denied NMC's motion for summary judgment. The court held the regulation was not "arbitrary and capricious" in violation of the Administrative Procedure Act, and was reasonable under the two-step analysis of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As to the related-party issue, the court held that the Secretary's decision that Old NMC and NMC Holding were related entities is supported by substantial evidence, and in particular by the role of the Management Investors in the transaction.

## II. Analysis

We review the Secretary's Medicare reimbursement decisions pursuant to the standards of the Administrative Procedure Act. *See* 42 U.S.C. § 1395oo(f)(1). The NMC providers claim that (1) the Secretary's determination that Old NMC and NMC Holding were related by control is not supported by substantial evidence; and (2) the regulation governing bad debt reimbursement is (a) not in accordance with law, under the standards of *Chevron* steps one and two, and (b) arbitrary and capricious.

### A. The Merger Issue

■ The NMC providers claim that the 1984–85 change in the ownership of NMC did not involve a related-party transaction within the meaning of the Medicare regulations. Therefore, they maintain, the Secretary should have permitted them to include the costs associated with the merger in their 1985 cost reports, thereby increasing the amount for which they could be reimbursed under the bad debt cap.

In general, depreciation and interest costs incurred in the acquisition of assets used to provide covered services are allowable Medicare costs. 42 C.F.R. §§ 413.134(a), 413.153(a)(1) (1996). Depreciation must be based upon the present owner's "historical cost" of acquiring the asset. *Id.* § 413.134(a)(2), (b)(1). When a Medicare provider is purchased by another organization the regulations permit the acquiring organization, for the purpose of calculating its allowable Medicare costs, to "revalue" the assets of the acquired provider up to the acquiring organization's cost of purchasing the assets. *See id.* § 413.134(g).

The regulations governing reimbursement of the cost of providing services to Medicare beneficiaries state that

> costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization.

*Id.* § 413.17(a). This rule is intended to prevent related parties from using transfer prices to inflate the cost of their inputs. *See Biloxi Regional Med. Ctr. v. Bowen,* 835 F.2d 345, 349–50 (D.C.Cir.1987). The rule also provides that a party is "related to the provider" if "the provider to a significant extent ... has control of or is controlled by the organization furnishing the services, facilities, or supplies." 42 C.F.R. § 413.17(b)(1) (1996). Control is, in turn, defined as "the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." *Id.* § 413.17(b)(3). The Secretary's guidance on the meaning of the regulation elaborates:

> The term "control" includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise.

U.S. Dep't of Health & Human Services, *Medicare Provider Reimbursement Manual,* Part I, § 1004.3, *reprinted in* 1 Medicare & Medicaid Guide (CCH) ¶ 5700 (Nov.1994) (hereinafter the *Manual*).

The appellants do not dispute that if the NMC merger was a related-party transaction, then the costs associated with the merger are not reimbursable by the Secretary. The question over which the parties are divided is whether the transaction between Old NMC and NMC Holding was in fact between related parties within the meaning of the regulations. The Secretary's decision that Old NMC and NMC Holding were related by control must be upheld if it is supported by substantial evidence in the record. 5 U.S.C. § 706(2)(E); *see also Biloxi Regional Med. Ctr.*, 835 F.2d at 349 n. 13.

There certainly is substantial evidence in the record supporting the Secretary's anterior determination that the Management Investors had the power significantly to influence the actions of both Old NMC and NMC Holding. That finding is itself sufficient to support the Secretary's conclusion that the firms were related by control. Because the Management Investors held key positions on the board and in the management of Old NMC, they were clearly in a position to influence the board to recommend, and the shareholders of Old NMC to approve, the transaction.

The Management Investors also had the ability significantly to influence NMC Holding. They had the power to appoint four of the eight members of the board and they held at NMC Holding essentially the same management and board positions that they had held with Old NMC. As a group they owned 37.20% of the voting securities of NMC Holding, and together with the Physician's Group—i.e. managers employed by the separate NMC facilities—controlled 50.01% of the voting shares. That the Management Investors were able to retain their positions and to come out owning a sizable portion of the voting securities of NMC Holding, while contributing only a small portion of the purchase money (approximately $2 million), further supports the inference that they controlled NMC Holding.

In addition, the chief negotiator for Old NMC (Dr. Hampers) was also one of the Management Investors in NMC Holding. He was essentially negotiating on both sides of the transaction. In fact, he signed the Merger Agreement on behalf of all three parties—Old NMC, NMC Holding, and NMC Acquisition. There is, therefore, substantial evidence to support the Secretary's conclusion that the acquisition of Old NMC was a transaction between related parties.

The appellants raise several arguments in an attempt to avoid this conclusion. First, they argue that the Secretary's interpretation of the related-party rule runs afoul of this court's decision in *PIA–Asheville, Inc. v. Bowen*, 850 F.2d 739, 741 (D.C.Cir.1988), where we invalidated as unrealistic and therefore arbitrary the Secretary's· rule that a two-step merger is per se a related-party transaction. The appellants contend that in this case the Secretary "artificially treated NMC Holding rather than Grace as the acquiring party and failed to analyze the transaction as a whole to determine if the purchase price for the NMC shares was the result of an arm's-length transaction." Indeed, they suggest that Grace and Old NMC had agreed upon the purchase price before NMC Holding even existed; therefore the focus of the inquiry should be upon the relationship between Grace and Old NMC—two parties that clearly were not related.

The appellants err in thinking *PIA–Asheville* helps their cause; the Medicare provider in that case came to be controlled by a previously unrelated company through a two-step acquisition, which the court held should be treated as a single integrated transaction. In this case a group of individuals with a significant stake in the acquiring company were in control of the acquired company. In any event, to the extent that the appellants' argument goes to the validity of the Secretary's interpretation of the rule defining a "related party," the Secretary's reasonable interpretation is entitled to our deference. *See, e.g., Marymount Hosp., Inc. v. Shalala,* 19 F.3d 658, 661 (D.C.Cir.1994). The Secretary interpreted the definition to require an examination of the relationship between the seller and the actual buyer—hardly an unreasonable interpretation of the rule.

Although Old NMC and Grace may have originally contemplated that Grace would be the buyer through an exchange of stock, in

the actual transaction NMC Holding was the buyer. NMC Holding was owned by the Management Investors and the Physicians' Group as well as by Grace; indeed, Grace did not own even a controlling interest in NMC Holding. Moreover, the appellants' suggestion that the acquisition price "was negotiated between Grace and NMC at arm's length at a time when they were clearly unrelated" is contrary to the evidence. Dr. Hampers and representatives of Grace discussed price on only one occasion prior to the parties' decision to structure the transaction as a leveraged buy-out. Most of the price negotiations took place after the parties had decided that the Management Investors would be participating in the leveraged buy-out through NMC Holding. By that point Dr. Hampers was dealing on both sides of the transaction, not at arm's length.

Second, the appellants argue that even if the transaction is viewed as one between NMC Holding and Old NMC, there was no control relation because NMC Holding could not control the decision of the Old NMC shareholders to approve the transaction. The appellants also point out that the independent directors, whom the Management Investors did not control, approved the transaction.

■ The appellants' implicit reliance upon the "fairness" of the transaction—as reflected in the participation of the independent directors—is insufficient to undermine the Secretary's conclusion. As long as the parties are related, fairness is irrelevant: the Secretary need not show that the terms of their transaction are unfair, *see Stevens Park Osteopathic Hosp., Inc. v. United States,* 225 Ct.Cl. 113, 633 F.2d 1373, 1379 (Ct.Cl.1980); *cf. Biloxi Regional Med. Ctr.,* 835 F.2d at 350; *West Seattle Gen. Hosp., Inc. v. United States,* 230 Ct.Cl. 132, 674 F.2d 899, 904 (Ct.Cl.1982), and the parties may not show that they were fair. Nor does the Old NMC shareholders' having final authority to approve the transaction mean that Old NMC and NMC Holding were not in fact related by common control. Such control may obtain in fact "whether or not it is legally enforceable." *Manual* § 1004.3, *supra,* at ¶ 5700.

In sum, there is overwhelming evidence in the record that the Management Investors had the power "significantly to influence or direct the actions or policies" of both the buyer and the seller. Therefore, the Secretary's decision that the two parties were related by control is supported by substantial evidence.

### B. Cap Upon Reimbursement for Bad Debts

The appellants claim that the rule capping reimbursement for bad debt at the provider's cost of service is inconsistent with the statute and therefore invalid under the familiar tests of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The appellants also maintain that the regulation is arbitrary and capricious and therefore invalid under 5 U.S.C. § 706(2)(A).

■ Under *Chevron* step one the court asks "whether Congress has directly spoken to the precise question at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781; if so, then we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. at 2781. If the Congress has not addressed the issue, however, then under *Chevron* step two we must determine whether the agency's interpretation of the statute is reasonable. *Id.*

■ The NMC providers argue that the bad debt reimbursement regulation fails under *Chevron* because (1) the Congress required a prospective-rate system, whereas the cap upon reimbursement for bad debts is based upon a retrospective calculation; and (2) the Congress intended to provide an incentive for increased efficiency in the provision of dialysis services, whereas the cost limitation upon reimbursement for bad debts reduces the provider's incentive to hold down its costs.

We conclude that the regulation passes muster under *Chevron* step one because the statute does not speak directly to the question of bad debt. The statute generally requires the Secretary to pay 80% of a prospectively determined rate. *See* 42 U.S.C. §§ 1395rr(b)(2)(A) & (b)(7). No provision in

the statute, however, specifically addresses how bad debt is to be reimbursed; indeed, there is no clear requirement in the statute that bad debt be reimbursed at all. Therefore, we must defer to the Secretary's interpretation unless it is unreasonable.

██ We are unable confidently to evaluate the reasonableness of the Secretary's statutory interpretation under *Chevron* step two, however, because the Secretary has provided an incoherent justification for her decision to cap reimbursement for bad debts. The only statutory authorization the Secretary relied upon in the rulemaking record for her decision to cap reimbursement for bad debts is the prohibition of cross-subsidization in 42 U.S.C. § 1395x(v). In the preamble to the final rule the Secretary decided to cap reimbursement for bad debts at the provider's reasonable cost because "the statute requires that [Medicare] pay only for the costs of services related to care of beneficiaries." 48 Fed.Reg. at 21,273.

Before this court counsel for the Secretary understandably wants to present a different account of the Secretary's reasoning. The Secretary's brief thus suggests that the cap upon bad debt reflects the balance she struck between the prohibition of cross-subsidization and the statutory requirement that Medicare pay 80% and beneficiaries pay 20% of the prospective rate. She argues that historically Medicare reimbursed providers for their bad debts based upon the Secretary's statutory mandate to avoid cross-subsidization. When the Congress amended the statute to require a prospective payment system it retained, in the section directing the Secretary to promulgate regulations governing the rate to be paid for dialysis services (§ 1395rr(b)(2)(B)), the express cross-reference to the provision defining reasonable cost and prohibiting cross-subsidization (§ 1395x(v)). That is, the statute permitted the Secretary to set the rate upon "any basis authorized under" § 1395x(v), which apparently would include a rate based upon "rea-

sonable cost" and the prohibition of cross-subsidization. Because the Secretary based the prospective rate upon reasonable cost principles, she argues, "it makes perfect sense" that she chose to cap bad debt at cost in order to comply with the prohibition of cross-subsidization.

We reject the Secretary's attempt in this litigation to articulate a new justification for the cap upon bad debt. The record does not support the Secretary's contention that she engaged in a balancing of the kind she describes. The Secretary acknowledges that her balancing is "not detailed" in the rulemaking record, but we do not think it is even implicit.

More important, we conclude that the Secretary's explanation for the cap upon bad debt reimbursement that is in the record is inconsistent with the prospective rate scheme of the statute. A prospective payment rate based upon the median provider's cost per treatment by definition overcompensates some Medicare providers and undercompensates others. Insofar as the Secretary reimburses some providers more than their actual cost of treating Medicare beneficiaries, she is effectively subsidizing services for non-beneficiaries—at least as contemplated by the Congress in § 1395x(v)(1)(A). Conversely, if the Secretary reimburses other providers less than their actual costs, then those providers will shift costs to nonbeneficiaries—again, at least so far as the statute is concerned.[2]

Nonetheless, with respect to bad debt the Secretary suggested in the preamble to the final rule that the prohibition of cross-subsidization required her to cap reimbursement at the individual provider's actual cost. The rulemaking record, however, provides no clear rationale for why the statute requires her to consider the prohibition of cross-subsidization in reimbursing for bad debt, when the requirement of the statute that she set a prospective rate is itself inconsistent with the

---

**2.** We are aware of no reason to believe that a Medicare provider that is overcompensated by Medicare would take the occasion to subsidize its non-Medicare patients; nor can we imagine why a Medicare provider that is undercompensated would continue to participate in the Medicare

program. The Congress appears to have assumed in § 1395x(v)(1)(A), however, that just such cost-shifting would occur. As neither party to this case takes issue with that premise, nor shall we.

prohibition of cross-subsidization. Until the Secretary provides such an explanation we cannot conclude that the prohibition of cross-subsidization justifies the cap upon bad debt reimbursement.

The appellants also argue that the cap upon reimbursement for bad debts is arbitrary and capricious because there is not a similar cap upon reimbursement for bad debts under Part A, which applies to dialysis treatments provided to hospital inpatients. See 42 C.F.R. § 412.115(a) (1996). The Secretary counters that the section of the Medicare statute creating the Part A prospective payment system, 42 U.S.C. § 1395ww, does not authorize her to draw upon the prohibition of cross-subsidization in § 1395x(v).

The appellants' argument further highlights the difficulty with the Secretary's reliance upon the prohibition of cross-subsidization as the sole justification for the cap upon reimbursement for bad debt. If, as the Secretary argues, the only statutory basis for reimbursing bad debt is the prohibition of cross-subsidization, then she must not be authorized to reimburse bad debt under Part A because Part A does not refer to the prohibition of cross-subsidization.

In sum, the Secretary's only explanation for the cap upon reimbursement for bad debt is the necessity to avoid cross-subsidization, but a prospective rate scheme necessarily entails a certain amount of cross-subsidization. Because the Secretary's explanation of the rule is inadequate, we cannot evaluate whether the Secretary's interpretation of the statute is reasonable within the meaning of Chevron step two. For the same reason, we cannot resolve the appellants' argument that the cap upon reimbursement for bad debt is severable from the rest of the regulation. Accordingly, we vacate the rule and remand this matter for the Secretary either to provide a more adequate explanation of the bad debt cap or to jettison it.

### III. Conclusion

We hold that: (1) The Secretary's decision that the merger between Old NMC and NMC Holding was a related-party transaction is supported by substantial evidence; but (2) the Secretary has not adequately justified the rule capping reimbursement for bad debts, as a result of which her order adopting the rule is arbitrary and capricious. At the same time we are unable to evaluate whether the Secretary's interpretation of the statute is permissible under Chevron step two. Therefore, we vacate and remand this matter for further proceedings not inconsistent with this opinion.

*So ordered.*