**TEXAS GRAY PANTHERS,**
et al., Plaintiff,

v.

Tommy G. THOMPSON, Secretary of Health and Human Services; and, William A. Halter, Acting Commissioner of the Social Security Administration, Defendants.

Civil Action No. 99–1557 (RWR).

United States District Court,
District of Columbia.

March 28, 2001.

Burton David Fretz, National Senior Citizens Law Center, Washington, DC, Patricia Baggs Nemore, Center For Medicare Advocacy, Washington, DC, for plaintiff.

Lisa Ann Olson, U.S. Department of Justice, Washington, DC, Sheila Mae Lieber, U.S. Department of Civil Division, Washington, DC, for defendants.

### *MEMORANDUM OPINION*

ROBERTS, District Judge.

Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1995), claiming that defendants[1] have unlawfully withheld agency

---

1. Tommy G. Thompson, the current Secretary of Health and Human Services, and William A. Halter, the Acting Commissioner of the Social Security Administration, are substituted as the defendants in lieu of former Secretary Shalala and former Commissioner Appel. *See* Fed.R.Civ.P. 25(d)(1).

action regarding their duty to give certain notice to Medicare beneficiaries eligible to enroll in Medicaid "buy-in" programs as required by 42 U.S.C. § 1395b–3 and section 154 of Pub.L. No. 103–432. Defendants have moved to Dismiss or, in the Alternative, for Summary Judgment. Because I find that (1) plaintiffs have standing to bring their claim; and (2) judicial review of defendants' action in this case is appropriate, defendants Motion to Dismiss will be denied. However, because I find that defendants' actions do not constitute an unreasonable interpretation of their statutory responsibilities, defendants' Motion for Summary Judgment will be granted.

### BACKGROUND

Medicare is a federally funded and administered health insurance program available to all Americans over the age of 65. 42 U.S.C. §§ 1395–1395gg. It is not free. Beneficiaries must share costs with the government in the form of deductibles, coinsurance, and premiums. Most beneficiaries are automatically eligible for Medicare Part A, which provides for hospital coverage, and do not pay a premium for these benefits. (Compl. at ¶ 17.) In 1999, the Part A premium for those not automatically enrolled was $309 per month. (Compl. at ¶ 22.) Those beneficiaries who choose to enroll in the optional Medicare Part B, which provides for outpatient and physician coverage, must pay a monthly premium. In 1999, the part B premium was $45.50 per month. (Compl. at ¶ 17.) Monthly Medicare premiums are automatically deducted from the Social Security, Railroad Retirement, or Civil Service Retirement checks of beneficiaries. 42 U.S.C. § 1395s.

To relieve the financial hardships wrought by cost-sharing upon low-income Medicare beneficiaries, Congress enacted several "buy-in" programs linked to the Medical Assistance program ("Medicaid"). Medicaid is jointly funded and administered by the federal and state governments and is available to those whose income and assets fall within specified guidelines. 42 U.S.C. § 1396a *et seq.* There are five major buy-in programs.

The first program is the Qualified Medicare Beneficiary program ("QMB"), which became effective in 1989. QMB pays the Part B premium, all Medicare coinsurance and deductibles, and sometimes the Part A premium, for those who are enrolled. (Compl. at ¶ 19; Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mot.") at 2–3.) To qualify, a beneficiary's income must fall below the poverty level [2] and his resources must not exceed $4,000 for an individual or $6,000 for a couple. 42 U.S.C. §§ 1396a(a)(10)(E)(i), 1396d(p)(1), 1396d(p)(3). (Compl. at ¶ 19; Defs.' Mot. at 2–3.)

The second program is the Specified Low–Income Medicare Beneficiary program ("SLMB"), which became effective in 1990. SLMB pays the Part B premium, but not deductibles or coinsurance, for those who are enrolled. (Compl. at ¶ 20; Defs.' Mot. at 3.) To qualify, a beneficiary's income must be within 100% to 120% of the poverty level [3] and his resources must meet the same requirements as under QMB. 42 U.S.C. §§ 1396a(a)(10)(E)(iii), 1396d(p)(3)(A)(ii). (Compl. at ¶ 20; Defs.' Mot. at 3.)

The third program is the Qualified Disabled and Working Individuals program ("QDWI"), which also became effective in

---

**2.** In 1999, the poverty level was $687 per month for an individual and $922 per month for a couple. (Compl. at ¶ 19).

**3.** In 1999, 120% of the poverty level was $824 per month for an individual and $1106 per month for a couple. (Compl. at ¶ 20).

1990. QDWI pays the Part A premium for those who are enrolled. To qualify, an individual must be below age 65, disabled, not automatically eligible for Part A, and have an income below 200% of the poverty level.[4] 42 U.S.C. §§ 1396a(a)(10)(E)(ii), 1396d(p)(A)(I). (Compl. at ¶ 22; Defs.' Mot. at 3.)

The fourth and fifth programs are the Qualified Individual–1 (QI–1) and Qualified Individual–2 (QI–2) programs, both of which became effective in 1998. QI–1 pays the entire Part B premium for those who are enrolled. (Compl. at ¶ 21; Defs.' Mot. at 3–4.) To qualify, a beneficiary's income must be below 135% of the poverty level.[5] 42 U.S.C. §§ 1396a(a)(10)(E)(iv)(I), 1396d(p)(3)(A)(ii). (Compl. at ¶ 21; Defs.' Mot. at 3–4.) QI–2 pays only a portion of the Part B premium for those who are enrolled. To qualify for QI–2, a beneficiary's income must be below 175% of the poverty level.[6] 42 U.S.C. §§ 1396a(a)(10)(E)(iv)(II), 1396d(p)(3)(A)(ii). (Compl. at ¶ 21; Defs.' Mot. at 3–4.) Unlike the other buy-in programs, QI–1 and QI–2 are block grants, awarded on a first-come, first-served basis and funded only through 2002. (Compl. at ¶ 21; Defs.' Mot. at 3–4.) They are not permanent entitlements.

Participation in a buy-in program is not automatic. A qualified beneficiary must enroll through one of a number of methods, most usually by filing an application at a local public assistance office. (Compl. at ¶ 24; Defs.' Mot. at 4). As of 1996, over 45% of all beneficiaries eligible for QMB, and almost 85% of all beneficiaries eligible for SLMB, were not enrolled. (Compl. at ¶ 24.)

In 1990, Congress enacted 42 U.S.C. § 1395b–3. Section 1395b–3(a) provides that:

The Secretary of Health and Human Services shall establish a health insurance advisory service program (in this section referred to as the 'beneficiary assistance program') to assist medicare-eligible individuals with the receipt of services under the medicare and medicaid programs and other health insurance programs.

Section 1395b–3 describes elements of this beneficiary assistance program (the "Program"), including methods of providing outreach, types of assistance to be provided, development of educational materials, notice to medicare-eligible beneficiaries and the general public, and annual reports to Congress. Section 1395b–3(c)(2)(B) states that the Program "shall provide for information, counseling, and assistance for medicare-eligible individuals with respect to ... linkages between the [M]edicare and [M]edicaid programs...."

In 1994, Congress amended section 1395b–3. The amendment requires the Secretary to establish a method of gathering and transmitting to the States information regarding the eligibility of new Medicare beneficiaries (the "Method"). The statute provides that:

[The Secretary] shall establish and implement a method for obtaining information from newly eligible medicare beneficiaries that may be used to determine whether such beneficiaries may be eligible for medical assistance for medicare cost-sharing under State medicaid plans as qualified medicare beneficiaries, and

---

**4.** In 1999, 200% of the poverty level was $1374 per month for an individual and $1844 per month for a couple. (Compl. at ¶ 22).

**5.** In 1999, 135% of the poverty level was $927 per month for an individual and $1245 per month for a couple. (Compl. at ¶ 21).

**6.** In 1999, 175% of the poverty level was $1202 per month for an individual and $1613 per month for a couple. (Compl. at ¶ 21).

for transmitting such information to the State in which such a beneficiary resides.

Pub.L. 103–432, § 154, 108 Stat. 4437 (1994) ("Section 154"), published at 42 U.S.C. § 1395b–3 (note).

Plaintiffs, who advocate for the interests of senior citizens, include numerous low-income Medicare beneficiaries in their memberships. (Compl. at ¶¶ 3–6.) They allege that, under section 1395b–3, defendants are responsible for establishing "a comprehensive plan of information, counseling and assistance to assure that low income Medicare beneficiaries learn about the buy-in program[s] and how to participate in [them,]" and that defendants have breached this responsibility. (Compl. at ¶ 1.) The primary relief they seek is an injunction ordering defendants to aggressively provide information and aid to those Medicare beneficiaries qualified for the buy-in programs.

Defendants have moved to dismiss, or, in the alternative, for summary judgment. They argue that (1) plaintiffs lack standing to bring the complaint; (2) the efforts of the Secretary of Health and Human Services ("the Secretary") pursuant to section 1395b–3 and section 154 are not subject to judicial review; and (3) if subject to judicial review, these efforts constitute a reasonable interpretation of his statutory responsibilities.[7]

## DISCUSSION

### I. *Motion to Dismiss*

#### A. *Standing*

■ Defendants have challenged the standing of plaintiffs to bring their claim. To establish standing under Article III, a plaintiff must demonstrate that: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) it is likely the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 456–57 (D.C.Cir. 1998). An organization has standing to sue if it meets this same test. *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C.Cir.1990). Defendants do not contest the first two elements. They do, however, argue that the harms alleged by plaintiffs would not be redressed by a favorable decision. Plaintiffs disagree.

■ This argument is, at bottom, about the nature of the harm alleged. Defendants argue that the harm alleged is solely economic—individual members must pay Medicare premiums which would otherwise be covered by the buy-in programs and the plaintiff organizations themselves must expend resources educating their members about the programs. Defendants argue that because the states have the primary responsibility for administering the buy-in programs and enrolling eligible beneficiaries, it is "sheer speculation" that ordering defendants to provide different or further information, counseling or assistance services under section 1395b–3 will result in increased enrollment in these programs, and reduced harm to the plaintiffs. Defs.' Mot. at 8–9.

Plaintiffs respond that the harm is not only the economic loss which results from a lack of information, counseling, and assistance, but the lack of information, counseling, and assistance itself. If defendants complied with their obligations under section 1395b–3, plaintiffs argue, this harm would be addressed by providing the required services to those who need it.

---

7. Defendants also have moved to dismiss on the ground that the Commissioner of the Social Security Administration is not a proper party. Because the defendants are entitled to summary judgment, I need not reach this issue.

Plaintiffs also argue that satisfactory delivery of these services will lead to increased enrollment in the buy-in programs and reduce the economic harms suffered by their members and themselves.

Plaintiffs have the better argument. An infringement of an individual's statutory right to receive information can support standing. *Pub. Citizen v. Fed. Trade Comm'n*, 869 F.2d 1541, 1548 (D.C.Cir.1989). In *Public Citizen*, plaintiff organizations had standing to challenge an exception to the warning label requirements of the Smokeless Tobacco Act in 1986 because their members were "being deprived of warnings to which they are legally entitled." *Id.* Further, affirmative denials of information, as with a request under the Freedom of Information of Act or the Federal Advisory Committee Act, constitute sufficiently distinct injuries to provide standing to sue. *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). Here, plaintiffs have statutory rights both to receive information, counseling and assistance through a beneficiary assistance program under section 1395b–3(c), and to be made aware of the program itself under section 1395b–3(e) and section 154. Plaintiffs allege defendants' failure to comply properly with these provisions has denied plaintiffs' members sufficient access to the information and services provided for in section 1395b–3. The allegation of such a denial of information to which one is legally entitled supports standing under *Public Citizen*.

Moreover, plaintiffs need not prove that granting the requested relief is certain to redress their injuries. *Int'l Ladies Garment Union v. Donovan*, 722 F.2d 795, 811 (D.C.Cir.1983), *cert. denied*, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39, (1984) (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 78, 98 S.Ct. 2620, 57 L.Ed.2d 595, (1978)).

Where the requested relief would only "significantly—rather than completely—redress the [plaintiffs'] injuries, this would be sufficient" to establish standing. *Id.* at 811–812 n. 27. Here, the primary harm alleged by plaintiffs is lack of information and services. Defendants argue that the remedy plaintiffs seek would "only mean that the Secretary would be required to disseminate the same information in a different way." Defs.' Mot. at 10. However, plaintiffs are not simply challenging the content of the information provided under section 1395b–3 but rather the "way" in which that information is provided, namely in a manner insufficient to reach eligible beneficiaries. Relief that would provide even the same information but in a manner that does reach all or most eligible beneficiaries would significantly redress the injury allegedly caused by defendants' inadequate provision of those services to plaintiffs' members eligible to receive them. It would further significantly redress the injury to the plaintiff organizations themselves by obviating the need for those organizations to educate their members about the buy-in programs. Accordingly, I find that plaintiffs have standing to bring their claims in this court.

### B. *Judicial Review*

Courts in this Circuit begin with "the strong presumption that Congress intends judicial review of administrative action ... and that the court will not deny review unless there is persuasive reason to believe that such was the purpose of Congress." *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1343–44 (D.C.Cir. 1996) (internal citations and quotations omitted). However, judicial review is not appropriate where either (1) Congress has affirmatively precluded judicial review or (2) the statute at issue is "drawn so that a court would have no meaningful standard against which to judge the agency's exer-

cise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Judicial review is not expressly precluded in the text of the statutes at issue here. Defendants argue, though, that (1) judicial review is precluded by the legislative history of section 1395b–3, which indicates the Program was to receive a lump-sum appropriation; and (2) that section 1395b–3 falls squarely within the second *Chaney* exception. These arguments are unpersuasive.

■ First, it is not clear that Congress meant to prevent judicial review of the Secretary's actions under section 1395b–3 by granting it a lump-sum appropriation. Defendants point to the Conference Report for section 1395b–3, which states that the Health Care Financing Administration ("HCFA") would be responsible for providing these services "pending available resources." H.R. Conf. Rep. No. 101–946, 101st Cong., 2d Sess. at 905, *reprinted in* 1990 U.S.C.C.A.N. They argue that this language indicates the Program is to be funded from the agency's lump-sum appropriation, which is traditionally regarded as committed to agency discretion and not subject to judicial review. *Lincoln v. Vigil,* 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).

However, Congress cannot place conditions upon the Secretary's use of funds through language in a conference report accompanying a bill. *Id.* at 193, 113 S.Ct. 2024. The plain language of the statutes gives no guidance as to how the program is to be paid for or whether allocation of funds for the Program or the Method should be left to the discretion of the Secretary. The snippet of legislative history relied on by defendants is neither an explicit nor an implicit preclusion of judicial review.

■ Second, the statute at issue here provides a "meaningful standard against which to judge the agency's exer-cise of discretion." *Heckler,* 470 U.S. at 830, 105 S.Ct. 1649. Agency action is committed to agency discretion by law if the statute authorizing the agency action is "drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Here, there is "law to apply."

Neither section 1395b–3 nor section 154 is couched entirely in terms of the Secretary's discretion. In *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), the Court declined to review a statute allowing the Director of the Central Intelligence Agency to terminate the employment of any employee whenever "the Director 'shall *deem* such termination necessary or advisable in the interests of the United States' ... This standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review." *Doe,* 486 U.S. at 600, 108 S.Ct. 2047 (emphasis in original). Defendants seek to draw a parallel here. They argue that the statutes require the Secretary to create the Program and establish the Method, but those actions are unreviewable because all aspects of these mandates are left entirely to his discretion. That premise is faulty.

■ Where a statute contains specific requirements for what actions an agency must take, it is not fully committed to agency discretion under *Overton Park,* even if details are left to the discretion of agency officials. *See Armstrong v. Bush,* 924 F.2d 282, 293 (D.C.Cir.1991) (finding there was "law to apply" in a statute providing that agency heads "shall establish and maintain" records management programs and "shall establish safeguards against the removal or loss of records[.]"). Section 1395b–3 states that (1) the Secretary "shall establish" the Program; (2) the

Program "shall provide assistance" through various outreach elements; (3) the Program "shall provide for information, counseling, and assistance for medicare-eligible individuals" with respect to specific topics; (4) the Secretary "shall develop appropriate educational materials" and other techniques to assist employers; (5) the Secretary "shall take such steps as are necessary" to make beneficiaries and the public aware of the program; and (6) the Secretary "shall include" a report on the program in an annual report to Congress. § 1395b–3(e). Further, section 154 states that the Secretary "shall establish and implement" the Method. While the words "appropriate," "as are necessary," and "method" indicate that the details of certain requirements are in the hands of the Secretary, neither one of these statutes "exudes deference" to the defendants.

 Third, agency action under the statutes in question is not wholly committed to the Secretary's discretion by law. This Circuit has identified three "pragmatic considerations" for courts to examine in determining whether judicial review is appropriate: (1) the need for judicial supervision to safeguard the interests of the plaintiffs; (2) the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and (3) the appropriateness of the issues raised for judicial review. *Armstrong v. Bush*, 924 F.2d 282, 293 (D.C.Cir.1991) (citing *Nat'l Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1043–44 (D.C.Cir. 1979)). After reviewing these factors, the court must "inquire whether the considerations in favor of nonreviewability thus identified are sufficiently compelling to rebut the strong presumption of judicial review." *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 497 (D.C.Cir. 1988). Defendants argue that the factors here weigh against judicial review. I disagree.

As to the first factor, judicial review is necessary to ensure that the Secretary's actions are not denying plaintiffs the services to which they are statutorily entitled. *E.g. Armstrong*, 924 F.2d at 288 (finding review of guidelines defining "records" under the Federal Records Act was necessary to ensure that documents to which plaintiffs were entitled were not destroyed); *Universal Health Services of McAllen, Inc. v. Sullivan*, 770 F.Supp. 704, 714 (D.D.C.1991) (finding review of regulations promulgated by HHS was necessary to ensure hospitals were not denied reclassification in an illegal or unconstitutional manner). Defendants argue that because they are already devoting resources to the Program and the Method, all that can be done is being done, and hence review is not appropriate. Following *Armstrong.* I cannot accept defendant's arguments. The information, counseling, and assistance of section 1395b–3 is to be provided to all qualified, "medicare-eligible individuals," many of whom are members of the plaintiff organizations. This gives plaintiffs an interest in seeing that the Program and the Method are administered in a legal and constitutional way. Judicial review is therefore appropriate.

As to the second factor, plaintiffs' challenge will not impede the effectiveness of the Secretary in carrying out his congressionally assigned role. Defendants argue that section 1393b–3 imposes on them a general obligation to inform beneficiaries about all Medicare and Medicaid programs, not merely specific information about the buy-in programs. They argue that any court-ordered attempt to meddle with the Secretary's efforts regarding the buy-in programs will cause beneficiaries to be buried under an avalanche of undecipherable government forms and will require the Secretary to divert funds from other valuable programs to pay for it all. Although the Secretary predicts general

doom should review be granted, he offers no specifics as to how, or to what extent, his other responsibilities would be affected monetarily or administratively. Further, while review of agency procedures that are in flux may cut against judicial review, *see Tax Analysts v. Internal Revenue Service,* No. CA 97–0260, 1997 WL 720798, (D.D.C. Aug.21, 1997), the Secretary does not suggest that review of his current actions will interfere with their effectiveness.

As to the final factor, plaintiffs have raised an issue which is fully suited for judicial review: has the Secretary complied with the requirements of the APA, section 1395b–3, and section 154? It is the job of courts to consider such questions. The balance of these factors does not weigh against scrutiny by this court of the challenged agency action. I find that judicial review is appropriate here. Accordingly, I will deny defendants' Motion to Dismiss and consider their remaining arguments as a Motion for Summary Judgment.

## II. *Motion for Summary Judgment*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Accordingly "a party is only entitled to summary judgment if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact." *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir.1998) (*en banc*). As the movant, the defendant carries the initial burden to identify evidence demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party can then defeat the motion for summary

judgment by pointing to evidence in the record that creates a genuine issue of material fact. *See Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993).

▮▮▮▮ Here, there are no disputed issues of material fact. The disagreement here is over the nature of the Secretary's responsibilities and the sufficiency of his actions. In reviewing agency action, this court must first consider whether Congress has spoken directly to the precise question at issue, and then, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. *Id.* at 844, 104 S.Ct. 2778. By the express terms of Section 1395b–3, the establishment and implementation of that statute's requirements are entrusted to the Secretary.

### A. *The Statute*

The question of what the Secretary's responsibilities under section 1395b–3 actually are is at the heart of this case. Plaintiffs argue that section 1395b–3 is "clear and unambiguous" in requiring the Secretary to: (1) provide Medicare-eligible individuals with information, counseling, and assistance with buy-in programs through local federal offices, community outreach programs, and a toll-free telephone number; and (2) obtain information from newly eligible Medicare beneficiaries regarding their potential eligibility for the buy-in programs and transmit that information to the states. Plaintiffs allege that the Secretary has not met these obligations in full.

Defendants (in arguing that judicial review is not even appropriate) point out

that key terms in the statute are left undefined. This lack of definition, they argue, indicates a clear intention by Congress to let the Secretary have unfettered discretion in deciding how section 1395b–3 should be implemented. Defendants finally argue that because of the Secretary's current and future efforts along these lines, as well as other barriers preventing the realization of the statute's objectives, the Secretary is in reasonable compliance with the law.

 I find that the statutes are sufficiently ambiguous with respect to the specific contours of the Secretary's responsibilities to satisfy the first *Chevron* inquiry. Section 1395b–3 is not vague in requiring that the Secretary (1) create the Program; (2) provide "counseling, information, and assistance" for Medicare-eligible individuals with respect to topics including "linkages" between Medicare and Medicaid; and (3) "establish and implement" the Method. However, section 1395b–3 is ambiguous in defining what "information, counseling, and assistance" actually are. Section 1395b–3(c) lists a minimum number of subjects which must be covered by the beneficiary assistance program, but the statute does not set out any guidelines for the quantity or form of the "information, counseling, and assistance." [8] Section 154 is equally unclear in this regard, setting no boundaries as to what form the "method" of obtaining and transmitting information regarding newly eligible beneficiaries should take. Accordingly, I must defer to the Secretary's interpretation of these re-

quirements, unless it is unreasonable. *Kidney Center of Hollywood v. Shalala,* 133 F.3d 78, 86–87 (D.C.Cir.1998).

### B. *The Secretary's Efforts*

I am guided in my review of the Secretary's actions under the second *Chevron* inquiry by the recognition in this Circuit that the "tremendous complexity of the Medicare statute" requires "particular deference" to the Secretary's interpretation of its provisions. *County of Los Angeles v. Shalala,* 192 F.3d 1005, 1016 (D.C.Cir. 1999). Plaintiffs argue that defendants have not met their statutory duties because defendants' actions are not reasonably calculated to effectuate the law and do not, in fact, effectuate it. Defendants argue that their current and future efforts meet their statutory responsibilities and that other causes outside the Secretary's control are major contributors to the lack of enrollment in the buy-in programs by qualified beneficiaries.

The Secretary's current efforts are detailed in the Declaration of Rachel Block ("Block Declaration"), the Deputy Director for Medicaid and State Operations in the Health Care Financing Administration ("HCFA"). According to the Block Declaration, the Secretary has taken the following actions regarding his mandate to provide "information, counseling, and assistance" concerning the buy-in programs under section 1395b–3(c):

(1) HCFA provides new Medicare beneficiaries with an Initial Enrollment Packet which includes general information regarding the buy-in programs [9] and provides

---

8. Section 1395b–3(b) states that the program shall provide "assistance" through various channels, but does not address the content of that assistance.

9. Included in the Initial Enrollment Packet is the publication *Medicare: What You Need to Know About Medicare and Other Health Insurance.* This publication contains a section entitled "Assistance for Low–Income Medicare

Beneficiaries," which informs new beneficiaries,

> [i]f you qualify for assistance from the Medicaid program in your state, you will not have to pay any of your own money for Medicare's premiums, deductibles, and co-insurance. You may also be able to get long-term care in a nursing home through your state Medicaid program. To qualify:

methods by which beneficiaries can obtain more information.[10] Block Declaration Ex. A at 5–6. The packet is distributed monthly and the information it contains is updated "routinely." *Id.* at ¶ 8a–b;

(2) HCFA and the National Association of Insurance Commissioners publish an annual *Guide to Health Insurance for People with Medicare. Id.* at ¶ 8c;

(3) HCFA and the SSA notified all Medicare beneficiaries about the buy-in program through SSA's annual 1999 cost of living adjustment. *Id.* at ¶ 8d;

(4) HCFA provides information about the buy-in programs through the toll-free number 1–800–MEDICAR (1–800–633–4227). *Id.* at ¶ 8e;

> • You must be able to get Medicare's hospital insurance (Part A);
> • Your annual income level must be at or below the national poverty guidelines; *and*
> • You cannot have resources such as bank accounts or stocks and bonds worth more than $4,000 for one person or $6,000 for a couple (your home and first car don't count).
> If your income is just above the poverty guidelines, you may qualify for limited assistance.

Block Declaration Ex. A at 5–6.

10. The *Medicare* publication informs beneficiaries,

> [i]f you think you may qualify [for assistance,] contact your state or local welfare, social service, or Medicaid agency and ask about [QMB] or the Medicare Buy–In program. Explain that you think you qualify for help in paying your Medicare costs and you want to file your application.

Block Declaration Ex. A at 6. The publication refers beneficiaries with further questions to Social Security's toll-free number, 1–800–772–1213 and to the HCFA, which publishes two free publications: *Guide to Health Insurance for People With Medicare* and *Medicare and Managed Care. Id.*

11. The Home page of www.hcfa.gov/medicaid/dehmpg.htm states that the site

(5) HCFA maintains information about the buy-in programs on two sites on the World Wide Web: www.medicare.gov. and www.hcfa.gov/medicaid/dehmpg.htm.[11] *Id.* at ¶¶ 8f, 9k;

(6) HCFA mailed information and enrollment materials to potentially eligible beneficiaries in 1993, 1995, 1996, 1997 and 1998. Block Declaration at ¶ 9d–g;

(7) HCFA mailed media kits to approximately 2,000 federal, State, and local organizations in order to educate them about the QMB program in 1994. *Id.* at ¶ 9e;

(8) HCFA distributed posters describing the buy-in programs to over 1400 field offices of the SSA in 1998.[12] *Id.* at ¶ 9i;

(9) HCFA makes notification, informational, and educational materials available

> "provides information for Medicare beneficiaries about programs that can help pay for their Medicare out-of-pocket expenses. In addition, it provides policy and technical information for Federal, State, local and beneficiary advocates and representatives interested in learning more about the various dual eligible programs."

Block Declaration Ex. E at 1. The Home page provides links to additional pages entitled: (1) "Medicare Savings for Qualified Beneficiaries"; (2) "List and Definition of Dual Eligibles"; (3) "Do You Qualify for Medicare Savings?—Screening Tool"; (4) "Dual Eligible Income Limits"; and (5) "Dual Eligible Reports." *Id.*

12. A sample poster included images of two elderly people in medical settings. The accompanying text, in large, readable fonts, stated:

> Medicare Beneficiaries!
> good news!
> You may qualify for help in paying your **Medicare out-of-pocket** expenses.
> better news!
> You could save **$525** per year and more in medical expenses.
> best news!
> Your **State Medicaid** office will help you determine if you qualify.

Block Declaration Ex. E at 1 (emphasis in original).

to various state agencies, including Medicaid agencies, health insurance programs, agencies on aging, and state contractors. *Id.* at ¶ 9j;

(10) HCFA's regional offices engage in extensive ongoing outreach efforts, including conferences, public presentations, educational seminars, training, outreach, direct mailings, and health fairs.[13] *Id.* at ¶ 91;

(11) HCFA has developed a simplified application form and has encouraged its adoption by the states. Block Declaration at ¶¶ 10a-b, d;

(12) HCFA has hired a contractor to develop an additionally simplified and updated form, based on social marketing data obtained from various focus groups. *Id.* at ¶ 10e; and

(13) HCFA has engaged in efforts to identify additional barriers to enrollment and methods of breaching those barriers. *Id.* at ¶ 11.

■ According to the Block Declaration, the Secretary has adopted a three-step approach regarding his mandate to establish and implement the Method under section 154, under which HCFA (1) secures electronic data information from SSA containing the name, address, and social security benefit amounts for newly enrolled Medicare beneficiaries; (2) screens this information to identify Medicare beneficiaries eligible for QMB; and (3) makes this information electronically available to all states that request it. Block Declaration at ¶ 9a. HCFA informed the states of this process in 1995. *Id.* Ex. C at 1. At present, 19 states have elected to receive this information. *Id.* at ¶ 9b.

The Secretary plans additional future efforts under both section 1395b-3 and section 154. *Id.* at ¶¶ 12–19. Plaintiffs generally criticize these efforts as insufficient and ineffective. They specifically criticize the Secretary's action of obtaining the information required by section 154 through SSA and not directly from the newly eligible beneficiaries themselves.

Defendants have the better of the arguments here for two reasons. First, the record before me indicates that the Secretary's efforts reflect a reasonable interpretation of the mandate to provide "information, counseling, and assistance" regarding the buy-in programs under section 1395b-3. While the Secretary's efforts to date may not have not achieved the results desired by all parties, that fact alone does not mean that his efforts, as a matter of law, are unreasonable. There is no indication from the text or context of the statute before me that Congress meant for the legal sufficiency of the Secretary's efforts to be measured solely by their effectiveness. Even if such a measure were evident, by the plaintiff's own measure, over 50% of those beneficiaries eligible for one buy-in program, QMB, are actually enrolled. Compl. at ¶ 24. While such a result may not be fully effective as a matter of policy, it is certainly not unreasonable as a matter of law.

Second, the record before me indicates that the Secretary's efforts constitute a reasonable interpretation of his mandate to "establish and implement" the Method under section 154. While the Secretary is not obtaining the relevant information from the qualified beneficiaries directly, there is no indication that the statute con-

---

**13.** There are ten regional HCFA offices, all located in major metropolitan areas: Boston, New York, Philadelphia, Atlanta, Chicago, Dallas, Kansas City, Denver, San Francisco, and Seattle. Block Declaration Ex. G. Each office conducts outreach activities in its assigned region. *Id.* Details of events, and contact information for each office, is available to the public at www.hcfa.gov/medicaid/deroact.htm. *Id.*

templated only a direct method. Under the Secretary's current system, information comes from a beneficiary via the SSA and is screened by HCFA to determine if that beneficiary is eligible for a buy-in program. This is a reasonable method of "obtaining information." The relevant data are then made electronically available to the Medicaid program in the state in which the beneficiary resides. This is a reasonable method of "transmitting such information."

When Congress enacts an ambiguous provision within a statute entrusted to the expertise of an agency, it is implicitly delegating to that agency the power to fill in the gaps. *County of Los Angeles*, 192 F.3d at 1016. In section 1395b–3, Congress could have defined the specific contours of the "information, counseling, and assistance" it wished the Secretary to provide under the Program. In section 154, Congress could have specified what precise steps the Secretary should take under the Method or established a requirement that a certain percentage of qualified beneficiaries should be enrolled in the buy-in programs by a certain date. Congress did not take such action. I am unwilling, in light of this Congressional silence and the Secretary's unique ability to deal with the matters entrusted to his department, to declare that his interpretation of his statutory responsibilities are unreasonable. Unless and until Congress spells out the form of the "counseling, information, and services" to be provided under section 1393b–3 and/or the "method" for collecting and transmitting information regarding newly eligible beneficiaries under section 154, I will defer to the Secretary. Defendants' motion for summary judgment will be granted.

## CONCLUSION

Defendants' Motion to Dismiss will be denied. Plaintiffs have standing to bring their claim because (1) they have demonstrated injury in fact by means of associational standing; (2) they have demonstrated that this injury is traceable to defendants' conduct; and (3) their injuries would likely be addressed by a favorable decision. In addition, judicial review is appropriate here because (1) there is no express or implied preclusion of judicial scrutiny in the statute; (2) the statutes provide sufficient "law to apply"; and (3) the relevant pragmatic considerations which guide courts in this Circuit do not weigh against judicial review.

Defendants' remaining Motion for Summary Judgment will be granted. Under the *Chevron* test, the relevant details of the statutes are ambiguous and I do not find unreasonable the Secretary's interpretation of his responsibility to administer those details. An Order consistent with this Opinion shall be issued.